### HEUBLEIN et al. v. WIGHT et al.

(District Court, D. Maryland. November 19, 1915.)

1. CORPORATIONS ⊜320—MANAGEMENT OF CORPORATE BUSINESS—POWER OF COURTS TO REVIEW—RIGHTS OF MINORITY STOCKHOLDERS.

While, in general, a court is without authority to interfere with the management of the business of a corporation by a majority of its stockholders, yet their action in a matter in which their personal interests are opposed to the interests of the corporation is subject to review by the courts at the instance of minority stockholders.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1426–1431, 1433–1439; Dec. Dig. ⊜320.]

2. CORPORATIONS ⊜320—MANAGEMENT BY DIRECTORS—EXCESSIVE SALARIES—RIGHTS OF MINORITY STOCKHOLDERS.

A stockholder, who owned one-third of the stock of a corporation, held entitled to relief in equity against the action of the president, secretary-treasurer, and a selling agent, who were all members of the same family, owned a majority of the stock, and constituted a majority of the board of directors, in fixing their own salaries as officers at amounts which were unreasonably high, in view of the business and earnings of the corporation, and largely in excess of the value of the services rendered to the corporation, and this, although the same salaries had been in effect

---

for a number of years, during the time when the business was more prosperous.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1426–1431, 1433–1439; Dec. Dig. ⊛⇒320.]

In Equity. Suit by Gilbert F. Heublein and Louis P. Roberts against John H. Wight, William H. Wight, Frank L. Wight, and the Sherwood Distilling Company of Baltimore City. Decree for complainants.

Haman, Cook, Chesnut & Markell and Vernon Cook, all of Baltimore, Md., for plaintiffs.

Keech, Wright & Lord, W. H. De C. Wright, and Robert R. Carman, all of Baltimore, Md., for defendants.

ROSE, District Judge. The defendants are the Sherwood Distilling Company, a Maryland corporation, hereinafter called the Company, John H. Wight, its president, his brother, William H. Wight, its secretary-treasurer, and his son, Frank L. Wight, one of its salesmen. They are all citizens of Maryland. The two elder Wights between them hold a majority of its capital stock. Each of the three individual defendants is in receipt of a very substantial salary from the Company. These salaries are fixed by the directors. Each of them is a director, and the three of them constitute a majority of the board of five.

The plaintiff, Gilbert F. Heublein, is a citizen of Connecticut. He owns almost precisely one-third of the Company's stock. One-half of his holdings stand in the name of his coplaintiff, Louis P. Roberts. The latter has no real interest in the Company and no concern in the outcome of this litigation. When the word "plaintiff" is used, the reference is to Heublein.

The substantial complaint of the bill is that the three Wights have used their control of the stock and of the board of the Company to get for themselves salaries far in excess of the value of their services, and unwarranted by the financial condition of the Company. In July, 1915, the plaintiff, through his representative on the board, unavailingly sought to have these salaries reduced. The bill asks that such reduction be made by this court.

Many years ago the father of the two older defendants, and their uncle, one Edward Hyatt, went into the distilling business at York, Pa. They subsequently removed to Cockeysville, in this state, and were there established as early as 1868. They originally operated as copartners, but in 1882 the Company was organized with a capital of $30,000. The defendant John H. Wight was one of the original stockholders. He increased his holdings; he bought some of those of Hyatt. Ultimately all of his father's stock came to him and his two brothers, the defendant William H. Wight and one Alpheus H. Wight, who will be hereafter referred to. Hyatt died in 1894. The three Wight brothers owned among them 200 of the Company's 300 shares; 33 others stood in the name of a Mrs. Vanneck, a daughter of Hyatt. By the latter's will he left the remaining 67 shares to the defendant John H. Wight, in trust, to hold the same for 10 years for the benefit of his widow and daughter, and at the expiration of that period to turn over

50 shares to his widow and 17 shares to his daughter. For 10 years after the death of Hyatt the Wight brothers held in their own right, or one of them held in trust, all the stock of the corporation, except the 33 shares which belonged to their cousin, Mrs. Vanneck. The defendant John H. Wight had her full confidence. Dailey v. Wight, 94 Md. 269, 51 Atl. 38.

In September, 1905, shortly after the 10-year trust expired, there was a meeting of the board of directors of the Company. There were present only the defendants John H. and William H. Wight and one Geddes. The last named was bookkeeper of the Company, held none of its stock, and cannot be assumed to have been in a position to have exercised any judgment independent of that of the Wights. At this meeting the salary of John H. Wight was raised from $10,000 to $15,000 and of William H. Wight from $5,000 to $7,500. Their salaries have remained at those figures ever since.

About the time that this increase was voted, the 50 shares which had passed to Hyatt's widow, who had become a Mrs. Dailey, came upon the market. The stock was offered to the plaintiff and his brother, since deceased, and they ultimately bought it. Before doing so, however, they had one or more interviews with the defendants John H. and William H. Wight. The latter had neither liking nor respect for the Heubleins. They thought they knew that the Heubleins had been in the habit of mixing inferior, or at least less famous, whiskies with the Sherwood whisky, and then branding the compound in exact imitation of the Company's genuine and unadulterated product. This practice had been stopped about 1903. There had been an adjustment, with which the Wights professed themselves satisfied; but their opinion of the Heubleins apparently remained unchanged. They did not want the latter in the Company. They told them that if they bought the stock they should not forget they were buying a minority interest and would be only minority stockholders. Precisely what significance the Wights attached to this warning does not appear, otherwise than may perhaps be gathered from their subsequent actions. The record does not show whether they attempted to secure the stock themselves, or, if they did, why they did not succeed.

The annual profits of the Company for each of the six years from 1902 to 1907, inclusive, averaged $70,000, or 2⅓ times its then capitalization. The plaintiff paid for the stock he first purchased 15½ times its par value. In 1907 those interested in the Company thought it best to increase its capitalization. To this course the plaintiff consented. The Company distributed what may be called, for lack of a better term, a bond dividend of $300,000; that is to say, it issued $300,000 of bonds and at least attempted to secure them by mortgage. These bonds were distributed among its stockholders, so that every holder of one share of the Company's stock received $1,000 of the bonds. As the defendant owned 50 shares, he received $50,000 of bonds, and apparently still holds them. The capital stock was increased from $30,000 to $700,000; that is to say, for each share of the old stock 23⅓ shares of new were given. The earnings of the Company for the six years preceding this augmentation of the nominal capital would have allowed the payment

of 5 per cent. interest on the bonds and left enough for a dividend of between 7 per cent. and 8 per cent. on the new capital stock.

But, as has happened to many another company, the increase in capitalization was followed immediately by a great reduction in profits. The average of these for the eight years succeeding 1907 was $35,000 a year, or only one-half of what they had been for each of the six years preceding that date. In the answer and the various statements submitted by the accountants, the total profits for the eight-year period foot up $293,136.17; but in all fairness there should be deducted from this total a net loss of $12,872.91 incurred in the operation of the Dairy Food Company. All the stock of this latter company is held by the Sherwood Company; all its assets and liabilities appear upon that company's annual balance sheets. The subsidiary company's net loss in operation is carried as an asset of its parent. Of the remaining $280,-263.26, $120,000 has gone to pay interest on bonds. This left $160,-263.26, which was theoretically available for dividends on capital stock. Dividends, however, were paid in only four of the eight years. None were paid in 1909, and none have been paid in any year since 1912. During the eight years, the aggregate dividends paid were $133,000, or at the rate of $16,666 a year, a sum equivalent to a little over 2 per cent. on the capital stock. On its books, the net increase of the Company's surplus during the eight-year period was, after deducting the loss of the Dairy Food Company, $27,263.26. Nevertheless the excess of the value of the quick assets of the Company over its current liabilities is probably less that it was at the beginning of the period, as it certainly is less than it was in 1910, the first year for which a detailed balance sheet appears in the record. This result is due to the fact that the Company has had to lock up some $90,357.17 in the buildings and machinery of the Dairy Food Company. As a consequence, although the Company has since 1910 charged off $59,246.92 to depreciation, its building and machinery account shows an increase of $36,387.74 in the last five years. Moreover, in 1910 the Company was using some $76,-000 lent to it by its stockholders and friends. On July 1, 1915, this sum had been reduced to $35,000, and the Company will apparently shortly be called upon to pay off some $28,000 of that. The change in the state of the Company's affairs is reflected, among other things, in a reduction of the cash on hand from $66,531.27 on July 31, 1910, to $15,805.34 on the 1st of July, 1915.

Ever since the plaintiff became a stockholder, there has been recurring friction between him and the two elder defendants. From time to time he suggested that the salaries paid were very large. These suggestions were usually ignored and have never been accepted. Some years ago the plaintiff sought to have the Company's books audited by accountants of his own selection. The Wights refused. They said, and they doubtless believed, that the plaintiff's purpose was to secure a list of the Company's customers, so that he might unfairly compete with it for their trade, to his gain and its loss. Litigation followed. Wight v. Heublein, 111 Md. 649, 75 Atl. 507. When that case came back to the lower court to be tried, as the Court of Appeals directed, upon its merits, the parties reached an agreement that the Company

would put one set of auditors to work and the plaintiff another, but that those employed by him should have no access to the books which contained the names of the Company's customers. In a very few days after the audit began, two of the Company's employés, namely, its bookkeeper and its distillery superintendent, were each found to be defaulters in large sums, aggregating for the two, as finally determined, nearly $40,000. After this discovery, all the Company's books were thrown open to the plaintiff's auditors, under promise, however, that they would not copy the names of the customers. Up to that time the bookkeeping of the Company had been poor. The highly paid president and secretary-treasurer had assumed that the far more moderately compensated bookkeeper and superintendent needed no watching. Since then the accounting methods of the Company have been good. Its books are subject to annual independent audits. The auditors furnish a copy of their report to the plaintiff, omitting from his copy the names of the company's debtors, presumably to keep him from obtaining from such list the names of many of the Company's customers. This omission is unimportant, except that on one or two occasions the discovery otherwise by the plaintiff of certain facts which the list of debtors would have disclosed, and which, if known, might have given occasion for some more or less legitimate criticism, has led him to suppose that such facts had been intentionally suppressed. The friction and the hard feeling between the parties were thereby increased.

When in the first audit that was made the books covering the preceding five years were examined, the cost was considerable, and from the fact that the Company or the Wights had one set of auditors, and the plaintiff another set, the expense was larger than was strictly necessary. When the audit was completed, the plaintiff felt that, in view of the disclosures resulting from it, the Company should pay his auditors. The Wights thought not. After considerable negotiation, and apparently some friction, the Wights agreed that the Company should pay the bill upon condition that the plaintiff should sign a letter or receipt to the effect that:

"We accept this check in full settlement of all grievances which we have heretofore had against the Company, or its officers, so far as the conduct of the Company has been made known to us. We know of nothing which will interfere with our pleasant relations in the future, for which we earnestly hope."

This letter was dated January 12, 1911. About March 9, 1913, the plaintiff purchased 1,166 shares, which had formerly stood in the name of John T. Vanneck, apparently the son-in-law of Edward Hyatt. With this stock plaintiff acquired no bonds, so that, while he owns one-third of the stock, he has only one-sixth of the bonds. For some reason the plaintiff did not have this stock transferred to his own name, but to the name of one Louis P. Roberts, who, as already stated, is nominally a coplaintiff in this case. At the time of this last purchase the plaintiff knew, and had known for at least three years, that the defendant John H. Wight was drawing $15,000 a year salary, and his brother, William H. Wight, $7,500. In the three preceding years

the stock had paid dividends, although the dividend for 1912 was at the rate of only 3 per cent. For the second purchase plaintiff paid $25 a share, or a total of $29,150. His total investment in the Company is accordingly $106,650.

Upon his first investment of $77,500 he has for the 8½ years received interest on his bonds at the rate of 5 per cent. per annum, or $21,250 in all, and on his stock dividends to the amount of about $36,-900, or a total of $58,150, or at the rate of little less than 7½ per cent. per annum. On his second investment of $29,150, he has received nothing whatever. In the last three years of the period his total return on the $106,650 he has in the Company has been only $2,250 a year, or about 2 per cent. Not unnaturally, under these circumstances, the plaintiff's conviction that the salaries of the Wights were far too large has been intensified. In 1914 he renewed his protest against them. At that time the defendant William H. Wight said that, if the surplus of the Company was cut into during the next year, he would voluntarily agree to a reduction of his salary. During that next year the surplus was reduced, upon the face of the official audit, $4,738.98. In addition, plaintiff ascertained that there had been a loss of $2,174.59 upon a debt of a customer who had gone into bankruptcy. On the other hand, there was a net profit during the year in the operations of the Dairy Food Company of $3,724.63. This had not been brought into the profit and loss account of the defendant Company, but had been used to reduce an amount that was carried as due by the Dairy Food Company to the defendant Company. After these corrections are made, the net reduction in the surplus during the year amounted to $3,188.94. The defendant William H. Wight, however, says that there was no impairment of the surplus, because during the year the Company refunded to himself and his brother certain sums which they had individually paid for taxes on the capital stock standing in their names. What the amount of these taxes paid during the year was, or precisely upon what theory such payments were supposed not to be payments out of the Company's revenue or surplus, I confess I do not understand. At all events, he was not willing to accept any reduction in his salary.

It can be stated in passing that some two years ago the plaintiff had asked to be made a director of the company. The Wights were not willing, but they did thereafter elect to the board a gentleman who had sometimes represented the plaintiff at the stockholders' meetings in Baltimore, and who was manager of his business in Hartford, Conn. At the directors' meeting in July, 1915, there were present the three individual defendants, Mr. Alpheus H. Wight, a brother of John H., and William H., and the plaintiff's representative, Mr. Booth, so that at the directors' meeting there was actually represented every share of the company's stock. During the preceding year the defendant Frank L. Wight had been made assistant salesman of the Company at a salary of $4,200. He had previously been in its employ in other capacities at a compensation which had never exceeded $205 a month, or $2,460 a year. He succeeded a salesman whose salary in the later years of his connection with the Company was $4,000. Earlier in his

employment it had been less. The defendant Frank L. Wight was therefore employed in a business with which it does not appear that he had become familiar at $200 a year more than the experienced man who had preceded him had received.

At the directors' meeting in question, Mr. Booth moved that the salary of the president be reduced to $7,500 a year, and that of the secretary to $5,000. At first this motion was not seconded. The defendant John H. Wight was in the chair, and he stated that, if it was not seconded, nothing more could be done with it. Thereupon Mr. Alpheus H. Wight said he did not wish to be placed in a position of antagonism to his brothers, but in order to bring the motion before the meeting he would second it. Mr. Booth voted for the resolution, the three individual defendants against it, and Mr. Alpheus H. Wight declined to vote either for or against it. Mr. Booth then moved that there be only one salesman, instead of two, and that the salary paid such salesman should not exceed $6,000 a year. At that time and now the Company is paying $8,000 to one salesman and $4,200 to another. On this resolution Mr. Alpheus H. Wight was recorded with Mr. Booth in the affirmative, but it was voted down by the three individual defendants. This suit followed.

At the hearing the plaintiff called as his first witness the defendant John H. Wight, apparently to show two things: First, that his services to the Company were worth only a small fraction of $15,000 a year; and, second, that in his relations with the Company, whether as president or director, it was impossible for him to get permanently out of his head the idea that the Company belonged to himself and his brother, that the plaintiff had no right to expect to be consulted about anything, that any questions he might ask about the Company or any suggestions that he might make as to its management were mere impertinences, and that subconsciously, if not consciously, the witness did not feel that the plaintiff had any right in the business which he and his brother were bound to respect. Perhaps no better witness to sustain both these propositions could have been found.

The Sherwood whisky is one of the celebrated whiskies of the country. It brings from 2½ cents to 5 cents per gallon more than most, if not all, other rye whiskies. Its reputation must depend in the first place upon the possession of qualities which make it attractive to consumers of a high-class whisky, and, secondly, on the skill with which it has been advertised and marketed. None of the defendants even claim that their services have in any way contributed to the first of these. Not one of the three knows or pretends to know the slightest thing about distilling. The president of the Company visits the distillery perhaps about half a dozen times a year, and when he is there he does nothing more than walk around and shake hands with the employés. The secretary-treasurer, during the operating season, does go to the distillery every morning, sometimes in the afternoon, but he knows nothing about the distiller's art. He looks after the construction and repairs.

For many years prior to 1913, the whole business of making the whisky, including the inspection of the raw material used, seems to

227 F.—43

have been absolutely in the hands of a superintendent, who received about $2,000 a year, and of a yeast man, who was paid $5 a day when the distillery was actually running. To them, or to the water used, or to some other still more occult cause, the quality which gave the whisky its vogue must have been due. With that part of the business the Wights had nothing to do. The efficiency of the distillery, as shown by the number of proof gallons of whisky obtained from each bushel of grain, was never very high. It seemed to be tending downwards. As the defendant John H. Wight said, they never tried to increase the yield. They never knew anything about it. They then employed a Mr. Boykin, who had made some study of scientific distilling, and had considerable practical experience in the management of distilleries, to examine the Sherwood plant, to see whether the yield could be improved. This gentleman found the machinery and arrangements antiquated. He thought that, if improvements were made, the yield would immediately increase. He was ordered to make the changes he recommended and to put the new methods into operation. He declined to do so unless he was employed for three years at $300 a month for each month during which the distillery was operated. He was not expected to spend all of his time at the distillery, or indeed, after the new methods had been put thoroughly into operation, any considerable portion of it. He accepted the employment, the changes were made, the methods recommended by him introduced, with the result of increasing the yield, which in the years 1912–13 had fallen to 3.93 proof gallons to each bushel of grain, to 4.25 gallons in the season of 1913–14, and to 4.33 in the season of 1914–15. What he did therefore resulted in an increase in yield of four-tenths of a gallon of whisky for every bushel of grain consumed. The yield in the season of 1914–15 was about 37,835 gallons more than it would have been, had the ratio of yield been no greater than it was two years before. At 57½ cents a gallon, the increased amount of whisky produced was worth $21,735. Mr. Boykin's employment will end at the close of the season of 1915–16.

A couple of years ago another son of the defendant John H. Wight, a man then about 40 years of age, who had been superintendent of an acid plant of a very large chemical company in Baltimore, at Mr. Boykin's suggestion gave up his place with the chemical company and went into the distillery, to act as understudy to Mr. Boykin, and to be ready to take his place when the latter's three-year contract expired. He was getting $50 a week at his former employment. He is paid $30 a week in his present, although, of course, he is now paid for a great many weeks during most of which he has little or nothing to do. He knew nothing of distilling until two years ago. Looking after the making of the whisky is not one of the things which the defendants John H. and William H. Wight do in return for the salaries they receive. It is equally plain that they are not close and careful supervisors of the Company's bookkeeping and office administration. So much was shown by the state of the books when the audit was made, and by the fact then revealed that easily detectable defalcations to a large amount and for a considerable time had been going on under their very noses. While the accounting system of the Company was good, it does not appear that

any of the individual defendants exercise any real supervision over it. Nor do they take such precautions as would be easily in their power to keep track of the Company's expenditures. For example, the salesmen are not required to render any expense account, but are allowed to draw what they please. Under such a system, or lack of it, it is not surprising that the sums expended by the defendant Frank L. Wight, in a three weeks' trip, appear to have averaged $30 a day. Nor was I impressed with the fact that either of them were of any special value to the Company as a credit man. The Company does not sell a great many different people. Its total customers number only 175, and they do not change very frequently. Nothing in the examination of either of the defendants, or of any of the other witnesses, suggested that they had any well-organized credit system. Their apparently very capable head salesman, Mr. McCunn, and Dun and Bradstreet seemed to be their equipment in that direction.

Their office hours, to say the least, are not excessive. During the four to six months in which the distillery was shut down, Mr. John H. Wight spends from about 10 o'clock, or a little before, at the Company's office, to the neighborhood of 1:30. In other seasons of the year he stays until from 3 to 5 o'clock, perhaps on an average to 4, or something after. His only connection with running the distillery is to determine when rye should be bought and how much shall be bought. He is no judge of rye and does not pretend to be. He simply makes up his mind how much rye it is judicious to buy at a particular time, in view of the needs of the distillery, as reported to him, and the state and prospects of the market as he sees them. He gives his orders to the grain brokers to make the purchase. They buy it, and when it arrives at the distillery it is inspected by the $2,000 superintendent, and accepted or rejected, according to the latter's judgment. It is unnecessary to say, however, that though these services probably take very little time, perhaps only a very few hours in the year, the skill and judgment with which they are done may, in seasons in which the price of rye markedly fluctuates, have a very material effect upon the profit and loss account of the Company. John H. Wight's good judgment, or the favorable conditions of the market, or the combination of both, during the past season, enabled the Company to resell at a profit of over $3,700 rye which had been bought in excess of its needs.

He specifies as a part of his work the fixing of the price of the whisky. It may be doubtful whether this is either a very important or a very arduous duty. The price for many, many years was always 55 cents. Three years ago it was raised to 57½ cents, and has never since been changed. He says that he manages the finances of the Company. Such management seems to consist in borrowing from one particular bank such sums as the Company may need, and in paying therefor, year in and year out, 6 per cent. interest, neither more nor less, no matter what the state of the money market may be. He has at times used securities of his own as collateral for advances to the Company. To avoid a detailed and irritating examination into his private affairs and the state of the accounts between him and the Company at various times, it was stipulated that his assumption of per-

sonal liability should not be taken into account by the court in appraising the value of his services to the Company. Of much that one who was so closely identified with a Company as he is, who has so large a portion of his fortune invested in it, who holds the position of its president, and who is so liberally compensated for what he does for it, should seemingly know, he professes himself ignorant. In some respects, it is true, this ignorance may be more in seeming than in reality. His indignation at being subjected to an examination as to what he does to earn his salary, combined perhaps with an inability to recall promptly things he really knows, may very probably have led to his making a far worse impression on the witness stand than the actual facts justified.

Nevertheless, after making all possible allowances, it must be said that in none of the respects thus far examined are the services he renders the Company of a high order or worthy of anything more than a very moderate compensation. The real value of himself and his brother to the Company must have been in keeping it in touch with the jobbers throughout the country, who were prepared to buy an expensive and high grade whisky. Of course, it is impossible to tell how much of this in the last 15 years has been the work of their salesmen, and for how much they are entitled to credit. Somebody, at some time prior to the employment of the present salesmen, must have succeeded in making the whisky known. However easy it may be to sell it on its reputation now, there must have been a time when a reputation for it had to be made.

It is probable that at present the most important detailed work with which John H. Wight busies himself is the determination when it is prudent to buy back the Company's product from some one who has bought it, and wants to get rid of it, and the finding, of course largely with the aid of the salesmen, some one who will take it off the Company's hands. There are other questions of policy, the right decision of which may be of vital importance to the Company. Some of these may be decided in a moment; some may require long reflection. When rye is high, and the demand for whisky poor, somebody must determine whether it is expedient to shut down altogether, or whether it is advisable to run, and, if so, for how long. All these are important duties; unwisely performed, the Company may lose greatly; wisely discharged, it may profit proportionately. Seeing and hearing Mr. Wight testify, it may not be easy to imagine that his judgment on such a question would be of great value. On the other hand, the Company was until 1907 eminently successful, and its sales, although not its profits, taking one year with another, have been since well maintained and even increased.

Nevertheless, making all allowances for the effect which the witness' extreme indignation at these proceedings, his dislike and contempt for the plaintiff, and his own ineradicable subconscious conviction that how he and his brother own the Company, and what he and the Wight family get out of it, is nobody's business, have in making him appear much less intelligent and efficient than perhaps he is, the salary which he, his brother, and his son continue to vote him seems far in excess

of the reasonable value of any and all the services which he renders the Company. The total business of the Company runs from $400,000 to $600,000 a year. His services do not require the performance of any considerable amount of detail work, nor do they in fact consume a large proportion of his time, nor when his time is employed in the Company's service is the work which he is required to do apparently much of a strain on either mind or body. Compared with salaries paid in public positions, the disproportion of this compensation is immense. A Senator of the United States receives one-half as much; the Chief Justice of the United States the same; each of the Associate Justices something less. No attempt has been made to prove that the heads of like corporations are ordinarily paid for similar services any such sum as the defendant receives. The witness Mr. Marcus, who has very large experience in such matters, testifies that, if the defendant were paid from $4,000 to $6,000 a year, he would be largely overpaid.

Without going into as much detail with reference to William H. Wight's services, he would seem at $7,500 a year to be extravagantly compensated; nor do I think there is any justification whatever for employing Mr. Frank L. Wight at $4,200 a year as assistant salesman.

[1] It has been asserted on behalf of the defendants that, whatever may be the opinion of the judge in this case as to the reasonableness of the salaries which the corporation fixed for its officers, he may not interfere. The courts, it is true, cannot run the internal affairs of corporations. If a majority of the stockholders of a corporation, in a matter in which their individual pecuniary interests are not in conflict with those of their company, acting honestly and in good faith, decide that certain salaries shall be paid, or certain expenses incurred, their judgment is ordinarily final, and may not be reviewed by the courts, however unwise or mistaken the individual judge or judges who hear the case may think them to have been. On the other hand, there is no question that, the courts may interfere if salaries are fixed in conscious bad faith, with intent to despoil the minority stockholders.

[2] The question here presented is, however, different from either of those supposed. Here the officers of a corporation themselves own the majority of its stock, and constitute a majority of its board of directors. They themselves alone assumed over the protest of some of the minority stockholders to fix the value of their services, and have appropriated the Company's money to pay for them at the figure so determined. Such valuation, moreover, seems to the court to be one far above any which a disinterested man might reasonably and honestly put upon them. Under such circumstances, is the decision arrived at by these officers, when acting as judges in their own case, conclusive? It would seem that it should not be necessary to cite authorities to justify a negative answer. When the question has been squarely presented, it is believed that such answer has always been given. Jones v. Morrison, 31 Minn. 140, 16 N. W. 854; Copeland v. Johnson Manufacturing Co., 47 Hun, 235; Butts v. Wood, 38 Barb. (N. Y.) 181. Like doctrine is laid down by the text-writers. 3 Clark & Marshall on Private Corporations, p. 2062, § 672-B; 3

Cook on Corporations, 2093 et seq. § 657. It has been asserted by the courts in many cases, in some of which upon the facts it was held not applicable. Jacobson v. Brooklyn Lumber Co., 184 N. Y. 152, 76 N. E. 1075; Francis v. Brigham-Hopkins Co., 108 Md. 233, 70 Atl. 95; Hayes v. Canada, Atlantic & Plant S. S. Co., 181 Fed. 289–296, 104 C. C. A. 271; Harris v. Lemming-Harris Agricultural Works ('Tenn. Ch. App.) 43 S. W. 871. Some of the courts have said that the action of officers in voting salaries to themselves was void; others, that it was good until challenged, but, when the challenge was given, the burden of showing the reasonableness of the salaries voted was upon the officer; and still others have perhaps assumed that it would be held justified until shown not to be so.

In this case it is unnecessary to inquire which is the true rule. Tested by any one of the three, the salaries complained of cannot be sustained. For the defendants it is urged that, whatever the law is as to votes raising salaries, the courts have no jurisdiction to require, at the request of a minority stockholder, the reduction of salaries which were paid before any complaint against them was made, and which have been, to the knowledge of such stockholder, paid for many years without his asking legal redress.

So far as the cases cited on either side are concerned this contention seems one of first impression. So approaching it, I do not see why the arm of the court should be tied by the circumstances relied on by the defendants. A minority stockholder might, it is true, be estopped from demanding the return of an excessive salary, the payment of which he had not seasonably sought to prevent. But it does not follow that he may not at any time interpose his protest and demand to be heard by the court as to the rightfulness of the continuance of such payments. Long delay in raising such a question may well suggest that in point of fact the salaries were not so unreasonable as upon the other evidence they may seem to be. In that connection it might, however, be borne in mind that the Company is not now rolling in the wealth which once seemed to be pouring in to it. Its expenses are now absorbing so large a proportion of its income that the minority stockholders are well within their rights in asking that the salaries of the officers and employés shall be fixed with some relation to the value of the services rendered. The corporation cannot be appealed to because its every action is dominated by the men who are receiving the salaries complained of. There was nothing in the demeanor of John H. Wight when on the witness stand to suggest that he was an exception to the time-honored rule that no man is fit to judge his own case. Years ago John H. Wight borrowed from the Company, without any formal action on the part of the board of directors, and without the knowledge of the minority stockholders, sums of money running up into many thousands of dollars. Doubtless the Company was secured against any possible loss. When the transaction was brought to the attention of the minority stockholders, his own counsel advised him that he had no right to act in that manner. That money was repaid, but so fixed is his feeling that the Company is his, that after this suit was brought, he, without the knowledge of any other officer of the Company, drew

out of its treasury, for his own use, $1,850 in excess of anything at the time possibly due him. It is true that he repaid it within a day or two after it was made a matter of comment in court. The suggestion is not that he had any dishonest intentions in his actions, but that he simply is incapable of separating the Company's interests from his own, or his own from that of the Company, and is therefore eminently disqualified to judge any question in which his interests and those of the Company are in conflict. It is not perceived how, as defendants claim, the letter of 1911 can preclude the plaintiff from now raising the salary question. He is not asking that the defendants shall be compelled to pay back any salaries received before 1911, or any salaries received before 1915, nor could anything in the letter be construed into a promise never to ask for a reduction of the salaries then being paid, no matter how greatly the financial circumstances of the Company might in the meantime change.

What has already been said is sufficient answer to the further suggestion that the purchase of additional stock in 1913 precludes the plaintiff from objecting in 1915 to the salaries now being paid, because they are the same salaries, except as to that received by Frank L. Wight, which were then paid. On the other hand, the court is not disposed to follow the lead of the plaintiff's counsel, and reduce the controverted salaries below the amounts at which, in July, plaintiff asked that they should be fixed. But to these figures they should be brought down. A salary of $3,000 per annum seems to be for the present a liberal compensation for Frank L. Wight.

A decree embodying these conclusions may be drafted.