# CHARLOTTE DAILEY AND WM. F. DAILEY *vs.* JOHN H. WIGHT, Trustee.

*Trusts—Insufficient Grounds for Removal of Trustee—Internal Management of Corporation.*

A testator who owned about one-third of the shares of stock in a corporation bequeathed a part thereof to his nephew, also a large shareholder, to be held in trust for the testator's wife. The corporation had been conducted as a family partnership and it had been customary for the shareholders to allow a large part of the earned profits to remain in the business as a working capital. The testator directed that for the period of ten years from his death the shares of stock so given in trust should not be sold except by the joint consent of the trustee and of the *cestui que trust*, and that the profits in the concern to the credit of the testator should not be withdrawn by the legatees thereof, who were his wife and daughter, except by the consent of the corporation for a like period of ten years. After the death of the testator, the trustee became president of the corporation and a salary was voted to him for his services as such. The testator's widow, entitled as beneficiary under said trust to two-ninths of the shares of stock of the corporation, filed a petition in the equity cause in which the Court had assumed jurisdiction of the administration of the trust, asking for the removal of the testamentary trustee or the appointment of a co-trustee, alleging as grounds therefor that the trustee had voted the stock held in trust for the purpose of giving himself a large salary as president of the company, whereas the former president, who was the testator, had served without a salary; that the corporation had carried large cash balances and at the same time borrowed money on interest from an institution in which the trustee was interested as a shareholder; that the trustee had refused to allow the petitioner's agents to inspect the books of the company; that the dividends paid were much below what they had been in the lifetime of the testator, and that the trustee had obtained commissions on the dividends received by him, while receiving from the company a salary as president. *Held*,

1st. That the evidence fails to sustain the allegations of the petition or to show any ground for the removal of the trustee.

2nd. That the object of the testator in the creation of this peculiar trust was to safeguard the welfare of the corporation, in which his near relatives were interested, as well as to provide for the *cestui que trust*.

3rd. That the Court cannot determine in this proceeding whether it was proper for the trustee to receive a salary as president of the company, because the evidence shows that the salary was voted by the shares of

stock not held in trust, and also because that is a matter relating to the internal management of the affairs of the corporation with which the Court in this case can have nothing to do.

4th. That the other allegations as to the management of the concern and the reduction of dividends relate to matters within the control of the corporation, and afford no reason for removing the trustee, and the evidence also shows that in these respects the affairs of the company were wisely managed, and that, although not bound to do so, the trustee did allow the petitioners' agent to examine the books of the company.

5th. That if the commissions received by the trustee are excessive, the petitioner is entitled to except to the ratification of the accounts in which they are allowed.

Appeal from an order of the Circuit Court of Baltimore City, (Ritchie, J.), dismissing the petition in the case.

The cause was argued before McSherry, C. J., Fowler Briscoe, Page, Pearce, Schmucker, and Jones, JJ.

*Charles J. Bonaparte*, for the appellants.

*Edgar H. Gans* and *W. H. DeC. Wright*, for the appellee.

McSherry, C. J., delivered the opinion of the Court.

John H. Wight was, by the will of Edward Hyatt, appointed trustee to hold sixty-seven shares of the capital stock of the Sherwood Distilling Company. Fifty of those sixty-seven shares were to be held in trust for the widow of the testator and the remaining seventeen shares were to be held for Mrs. Vanneck, a daughter of the testator by a former marriage. Mr. Hyatt died early in November, eighteen hundred and ninety-four, and his will was duly admitted to probate by the Orphans' Court of Baltimore City. In June of the following year Mr. Wight filed a petition in the Circuit Court of Baltimore City and asked the Court to take jurisdiction over the trusts above alluded to and a certain other trust under the same will; but the latter does not concern this proceeding and no further mention of it will be made. The Court thereupon assumed jurisdiction over the trusts, and two months later an order was passed fixing the compen-

sation of the trustee at eight per cent on the income reported
by him.   On January the eleventh, eighteen hundred and
ninety-nine, the widow of Mr. Hyatt, who had in the mean-
time married William F. Dailey, filed a petition in the Circuit
Court in the trust proceedings case, and in that petition she
set forth a variety of charges against the trustee and then
prayed that Mr. Wight be either removed as trustee, or else
that some other person be appointed co-trustee so far as con-
cerned the fifty shares of Sherwood Distillery stock held for
the benefit of the former Mrs. Hyatt.   The petition further
prayed that the order previously passed fixing the rate of the
trustee's commissions might be rescinded ; and it finally asked
that the petitioner or some reputable, fit and competent person
representing her be allowed full and free access to the books
of the Sherwood Distilling Company, and that John H. Wight
and all other persons connected with the company be enjoined
and strictly prohibited from in any wise interfering with or
obstructing her or her said representative in the exercise of
such right.   The petition was fully answered by the trustee ;
and on the tenth of March, eighteen hundred and ninety-nine,
the petitioners filed three motions which are substantially the
same as the prayers of the petition, with the exception of the
prayer asking for a rescission of the order fixing the rate of
commissions.   Subsequently another petition was filed which
was also answered ; but it need not be farther adverted to as
it does not affect the ultimate questions at issue.   Finally
considerable testimony was taken and the cause was heard
before JUDGE RITCHIE, who, on April the nineteenth, nineteen
hundred and one, dismissed the petition of January the elev-
enth, eighteen hundred and ninety-nine, and overruled the
motions of March the tenth ; and from that order the present
appeal was taken.

There are no disputed legal propositions involved in the
case.   We have nothing to deal with but questions of fact.
Whilst the argument on behalf of the appellants took a wide
range it will not be necessary to follow it in detail, because
the case can be satisfactorily disposed of without discussing

each suggested or alleged wrongful act imputed to the trustee. A brief and condensed statement of the salient facts disclosed by the record will show the origin of the trust, the purpose and design of the testator in creating it; the peculiar relation of the trustee to the trust property and with the settlor during the latter's lifetime; and when these circumstances have been set forth as they are, and not as they have been mistakenly assumed to be, there will be not the slightest difficulty in determining whether the learned Judge of the Circuit Court was right in passing the order from which the pending appeal was taken.

If the examination of a question of fact be approached with the preconceived conviction that fraudulent conduct is hidden somewhere behind it, it is altogether likely that an entirely false coloring will be involuntarily given to perfectly innocent transactions. The assumption that fraud has been practiced, and the assumption of this in advance of an actual knowledge of the facts really existing, is often apt to mislead the judgment of the otherwise cautious investigator when he comes to the consideration, not of the supposed, but of the actual events and occurrences; and thus, frequently, " trifles light as air " become " confirmations strong as proofs of holy writ." Now, what are the facts ?"

In January, eighteen hundred and eighty-two, the Sherwood Distilling Company was incorporated with a capital stock of thirty thousand dollars divided into three hundred shares. All of the stock was held by Hyatt, by John J. Wight, his brother-in-law, and by John H. Wight, the appellee—the latter owning sixteen shares. In eighteen hundred and eighty-eight John H. Wight bought at par eighty-four shares from his father John J. Wight and from his uncle, Edward Hyatt; and then each of the three owned one hundred shares. Subsequently Hyatt transferred to his daughter Mrs. Vanneck thirty-three shares of his one hundred shares; and John J. Wight transferred to his two sons, John H. and William jointly, seventy-five of his one hundred shares, and to William, individually, the remaining twenty-five shares; but these trans-

fers by John J. Wight were made under and in accordance
with some arrangement between the father and the two sons
which does not appear in the record.   At the time of Hyatt's
death the stock stood in the way just indicated.   Hyatt was
president of the company up to the time of his death, and
John H. Wight was secretary and treasurer.   Both served
without salaries.   From the year eighteen hundred and eighty-
two to eighteen hundred and eighty-eight John H. Wight
received a commission as salesman which, with the dividends
on his sixteen shares of stock, amounted to some ten or eleven
thousand dollars a year; but when he acquired the additional
eighty-four shares of stock as above stated, his commissions
ceased, and it was understood between him and Hyatt that as
long as the latter lived the former was not to be entitled to
any salary.   As very large sums of money were required to
conduct the distilling business, it had grown to be a custom
for Hyatt and the Wights to allow a considerable portion of
the earned profits to remain in the concern.   The proportions
of those profits to which the stockholders were entitled were
carried each year to their credit, and interest at the rate of six
per cent per annum was allowed thereon.   In that way there
had accumulated to the credit of Hyatt at the time of his
death some eighty odd thousand dollars, and there stood to the
credit of John J. Wight nearly or quite one hundred thousand
dollars.   Occasionally some of the earned profits thus carried
to the credit of the parties was withdrawn and upon the sums
withdrawn the shareholder making the withdrawal would be
charged six per cent interest.   The business was conducted
up to the time of Hyatt's death rather as a family partnership
than as a corporation.   A sudden withdrawal of the earned
profits standing to the credit of Hyatt and the Wights would
probably have caused a collapse of the whole business, inas-
much as there was no cash capital or surplus fund, other than
those credits, to which the corporation could look for the
means to meet its large demands for available money.   This
being the relation of the parties to each other and to the com-
pany, and this being the condition of the business, it was quite

natural and highly prudent that Hyatt, when he made his will, should, as far as his foresight would enable him, guard against the probable dangers and disasters that were likely to overtake the concern if his sixty-seven shares of stock were to go into the possession of individuals hostile or unfriendly towards his former associates ; or if his eighty odd thousand dollars of earned credits were immediately taken out of the hands of the company. Obviously he had the utmost confidence in the integrity of his nephew, the appellee, upon whom he was aware the whole management of the affairs of the company would ultimately devolve ; and he accordingly made the following provisions in his will, viz. " Fifth. I bequeath to my nephew, John H. Wight, sixty-seven (67) shares of stock of the Sherwood Distilling Company standing in my name ; *In Trust,* as to fifty shares thereof for the use and benefit of my wife, Charlotte Hyatt ; and as to the remaining seventeen shares thereof for the use and benefit of my daughter, Amy Vanneck ; said stock or any part thereof during the period of ten years from the date of my death may be sold only by the joint assent and transfer of said John H. Wight, trustee thereof *and* of said Charlotte Hyatt or Amy Vanneck respectively, as the case may be, and in no other manner. After the lapse of that time, my said wife and daughter, or their personal representatives shall be at liberty to dispose of their respective shares as they may desire. * * * * * * * * * Sixth. I bequeath the money due to me by the Sherwood Distilling Company to my wife, Charlotte, and my daughter, Amy Vanneck, equally to be divided between them share and share alike, but I will that the same shall be allowed to remain in the hands of said company at interest and not to be withdrawn from it without its consent for the period of ten years after my death—*Provided* always that if the said company shall meanwhile desire to pay off the whole or any part of its current indebtedness and equalize thereby the amounts due to its creditors, or reduce the same, then my wife and daughter shall be entitled to demand and receive their just *pro rata* proportion of the amount so paid off by said company."

The trust created by the fifth clause was not an ordinary trust. The testator had two distinct ends in view. He considered not only the interests of the *cestui que trustent*, but likewise the welfare of the company. And whilst the trustee was to hold the sixty-seven shares of stock for the purposes indicated, the equitable owners were not permitted to dispose of their interests for a period of ten years ; just as the legatees of the earned credits were not allowed, under the sixth clause, to draw out those credits until after the expiration of the same length of time. Both of these restrictions were imposed for the benefit of the company and due weight must be given to them in considering the accusations made against the trustee.

After the death of Mr. Hyatt the management of the whole of the business devolved upon the appellee. At that time he was the owner in his own right of one hundred shares of the company's stock ; he and his brother, William Wight, held in their joint names seventy-five shares of their father's stock ; William held in his own name twenty-five shares ; Mrs. Vanneck held thirty-three shares and the appellee also held under Hyatt's will, in trust, the remaining sixty-seven shares. Whilst the stock stood in this way the corporation voted to the appellee as president, a salary of ten thousand dollars a year, and to his brother William, as treasurer, a salary of five thousand dollars a year ; and it is alleged as one of the grounds for the removal of the appellee from his position as trustee, that he, by voting the sixty-seven shares which he held in trust together with the one hundred shares which he held in his own right—the two holdings aggregating one hundred and sixty-seven shares, or a majority of the three hundred shares—made use of his fiduciary relation to secure for himself a large salary at the expense of the *cestui que trustent*, though no reason existed for paying him a salary that did not exist with respect to the late Edward Hyatt, who never received or demanded any salary as president. The facts do not sustain the allegations. Seven-ninths of the company's stock stood in the names of the appellee, his brother and his

cousin, Mrs. Vanneck, when the salaries were voted, and Mrs. Vanneck has filed a petition in the case asserting her entire confidence in the integrity of Mr. Wight and asking that he be not disturbed in the administration of the trust. So it is perfectly obvious that the sixty-seven shares held in trust, constituting as they do, but two-ninths of the whole number of shares, were not needed to give the appellee, with his own holdings, a majority to carry the resolution voting to himself a salary. And as the owners of two hundred and thirty-three shares and the equitable owner of seventeen shares, making two hundred and fifty out of the whole three hundred shares, are content and satisfied that the appellee should receive the salary he now draws, it is far from accurate to say that the voting of the salary was "an obvious breach of his duty as trustee." There is not the slightest evidence that he did vote the stock held in trust to secure for himself a salary. It must be remembered that prior to the purchase by John H. Wight of a one-third of the stock he received a commission on sales, the aggregate of which commissions equalled and sometimes exceeded the amount of the salary he now draws ; and that when he ceased to charge commissions it was with the distinct understanding had with Mr. Hyatt that during the life of the latter no salaries were to be paid. Conditions changed after Hyatt's death and, as he had in his lifetime foreseen and anticipated, the whole labor devolved on the appellee. Whether any salary ought to have been paid to him as president is not for this Court on this proceeding to determine. And it is not for us to determine, *first*, because there is nothing to show that the appellee voted the shares held in trust to secure the salary, but on the contrary it is distinctly evident that the salary was voted by the two hundred and thirty-three shares not held in trust ; and, *secondly*, because, it is strictly a question of internal management of corporate affairs with which a Court of justice has, ordinarily, and under the averments of the petition, can have no concern whatever. The Court could not have interposed even if the petition had been a bill filed by a minority stockholder. *Shaw v. Davis et al.*, 78 Md. 308. In *McDougall*

*v. Gardiner*, L. R. 1 Ch. Div. 21, JAMES, L. J., said. " nothing connected with the internal disputes between the shareholders is to be made the subject of a bill by some one shareholder in behalf of himself, and others, unless there be something illegal, oppressive or fraudulent—unless there is something *ultra vires* on the part of the company, *qua* company, or on the part of the majority of the company, so that they are not fit persons to determine it ; but that every litigation must be in the name of the company, if the company really desire it." In the same case MELLISH, L. J., after observing that very often, in companies things are done which ought not to be done, proceeds : " Now, if that gives a right to every member of the company to file a bill to have the question decided, then, if there happens to be a cantankerous member, or one member who loves litigation, everything of this kind will be litigated ; whereas, if the bill must be filed in the name of the company, then, unless there is a majority who really wish for litigation, the litigation will not go on. * * * * * * Is it not better that the rule shall be adhered to that, if it is a thing which the majority are the masters of, the majority in substance, shall be entitled to have their will followed ?"

Falling within the same principle are numerous other allegations with respect to the carrying of large cash balances on deposit at three per cent interest and borrowing at the same time at six per cent from an institution in which the trustee was individually interested as a shareholder. This was not done in virtue of the appellee's fiduciary relation. The fact that he held sixty-seven shares of the stock in trust had nothing to do with these transactions. Precisely the same things could have been done and probably would have been done had some entirely different person been trustee ; and no shareholder of the Distilling Company would have had a standing in a Court of equity to object so long as there was nothing fraudulent, *ultra vires* or illegal in the things complained of. We need not pause to consider whether the borrowing of money when there were large cash balances in bank and on deposit elsewhere was or was not a prudent policy

to pursue, because a Court of equity has no jurisdiction to settle such questions—they are business questions relating to the management of the company's concerns, and the persons who are interested—the owners of the stock—are alone entitled to decide these and like matters affecting their own interests. But if this subject were really before us, we see nothing in what has been done which at all impeaches the integrity or throws suspicion on the capacity of Mr. Wight either in his relation as trustee or as president of the company.

The denial by Mr. Wight of Mrs. Dailey's asserted right to examine, or to have some representative of hers examine the books of the Sherwood Distilling Company, can surely furnish no ground for the removal of the trustee. Wight was under no obligation to permit Mrs. Dailey or her representative to inspect and go through the books, and his refusal to allow that to be done is certainly no breach of trust. But in point of fact during the progress of the proceedings an expert accountant selected by Mrs. Dailey was given access to all the books that were necessary to enable him to verify the statements made by the treasurer ; and the accountant testified that " The statements of the treasurer are very brief while the statements I prepared are very much more in detail. *The final results, however, are in agreement.*" There was one error discovered but it has been fully explained. How, then, can a refusal to allow an inspection of the books be relied on as a sufficient ground for the removal of the trustee, since subsequently an inspection was permitted, and when made resulted in showing that the treasurer's statements were correct ? Inasmuch as those statements of the treasurer which are alleged in the petition of the appellants to be " *suspicious* " have been found by Mrs. Dailey's own expert to be accurate with a single unimportant exception, it becomes unnecessary to go through them, even if it were conceded that, on this inquiry, the operations and financial management of the corporation could be investigated and criticised.

The failure of the Distilling Company after Hyatt's death to pay as large dividends as it had done on two occasions pre-

viously, and its having passed a dividend for two years since the appellee became president, were much dwelt on in the argument as circumstances reflecting on the fitness of Mr. Wight to continue as trustee under Mr. Hyatt's will. With reference to this subject all that need be said is, *first*, that there is not the slightest logical or legal relation between the facts relied on and the conclusion sought to be deduced from them ; *secondly*, in this proceeding we have absolutely nothing to do with the policy of the company with respect to declaring dividends ; and *thirdly*, if the matter were before us in such a way as to require an investigation there would be no difficulty in reaching the conclusion that what was done in this behalf was wisely and prudently done. If dividends are not earned, dividends ought not to be declared; and if there is a shrinkage in net profits there must be or there should be an abatement in the per cent rate of the dividend. A shrinkage in net profits available for a dividend may arise from a decrease in the volume of business, or from a fall in the selling price of the commodity produced, or from additions to the plant, or from the accumulation or augmentation of a sinking fund to meet maturing obligations or to provide for contingencies demanding outlays of money in the legitimate prosecution of the business. The record shows that all these conditions existed, not concurrently as to all, but successively as to many. Of the forty thousand dollars due to Mrs. Dailey under the *sixth* clause of her former husband's will she has been paid nearly seventeen thousand dollars, and of the forty thousand dollars due to Mrs. Vanneck under the same clause, she has received over twelve thousand dollars ; whilst a surplus fund of over sixty thousand dollars has been created to be used in extinguishing the remaining twenty-three thousand dollars due to Mrs. Dailey, the remaining twenty-eight thousand dollars due to Mrs. Vanneck and the eighty or more thousand dollars due to the estate of John J. Wight, now deceased. The vicissitudes and fluctuations of business necessarily influence the policy of officers and directors intrusted with the management of a large manufacturing enterprise ; and a careful study

of the entire record fails to reveal an injudicious step taken, but on the contrary discloses commendably conservative judgment exercised, in respect to the distribution of profits in the shape of dividends. That Mrs. Daily has been disappointed because she has not received as large and as many dividends as she had been led by her late husband to expect that she would receive, may be true; but her disappointment is not unlike that of thousands of other persons, the dividend-paying value of whose investments depends on the earning capacity of industrial or manufacturing or other corporations that are directly and sensibly affected by the fluctuations and the hazards of trade.

Much stress is laid in the petition for the removal of Mr. Wight as trustee, on the fact that he has received under the order of the Circuit Court eight per cent commissions on the dividends collected by him as trustee from the Distilling Company for the benefit of Mrs. Dailey, at the same time that he was receiving from the company a salary as president. But that circumstance is obviously no ground for his removal as trustee. Nor is the further fact that he failed to inform the Court when it fixed his commissions, that he was receiving a salary as president of the company, a reason for displacing him as trustee. Mrs. Dailey had an opportunity before the ratification of any of the audits wherein the commissions were allowed to except to the rate of eight per cent as excessive; but she failed to interpose any objection. Even after her petition of January the eleventh, eighteen hundred and ninety-nine had been filed, two audits were stated making the same allowance of commissions, and those audits were suffered by her to be finally ratified without objection. It is too late now to open those ratified audits or to disturb the allowance of commissions made in them; but the petitioners are at perfect liberty hereafter upon the statement of the next account to file exceptions on the ground of the alleged excessiveness of the commissions and they will have a full opportunity to be heard.

Looking to the whole case and after a careful and patient

study of the entire record, we may, with strict accuracy, say that the proceeding throughout is founded on utterly groundless suspicions, unwarranted inferences and unsupported insinuations ; and we have not the slightest doubt that the learned Judge of the Circuit Court was right in dismissing the petition of January the eleventh, eighteen hundred and ninety-nine and in overruling the motions of March the tenth following. We have not considered it necessary to discuss the numerous cases cited in the brief of the appellant's learned counsel, because the facts of those cases are so essentially different from the facts in this case that the legal principles announced in them can have no application to this controversy. The trust created by Mr. Hyatt is a peculiar one and the trustee selected by him was obviously chosen with a view of protecting both the *cestui que trustent* and the Distilling Company, and we are fully satisfied that he has faithfully and conscientiously discharged his duty to each.

*Order affirmed with costs.*

(Decided January 16th, 1902.)