## RICHARD B. ADAMS *v.* MARY C. HEARN
[No. 61, January Term, 1935.]

*Decided May 2nd, 1935.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*George Weems Williams* and *G. Van Velsor Wolf*, with whom were *Marbury, Gosnell & Williams* on the brief, for the appellant.

*N. Irvin Gressitt,* for the appellee.

MITCHELL, J., delivered the opinion of the Court.

Walter A. Hearn was engaged in a window cleaning business for a number of years, which business he individually owned, operated, and exclusively controlled. In 1926 he incorporated this business under the name of the National Window & Office Cleaning Company, with a capitalization of $250,000, comprised of 2,500 shares of the par value of $100 each; taking in his own name 2,457 shares, and issuing the remaining forty-three shares to employees in his business. At the time of the formation of the corporation, by-laws were adopted, lodging the power to elect the president in the stockholders. Said by-laws also provided that the board of directors should have power to fix the compensation of all officers of the corporation, and might authorize any officer, upon whom the power of appointing subordinate officers may have been conferred, to fix the compensation of such subordinate officers. A resolution was unanimously passed by the board of directors appointing the president a committee of one, with authority, between meetings of the board, to exercise all of its powers in the management of the affairs of the company, and giving the president full control of its management and affairs, with the right to employ and discharge all employees.

Mr. Hearn was duly elected president, and his salary fixed at the sum of $400 per week. Among those regularly paid by the company were William Ellis, a private chauffeur of Mr. Hearn, and Mrs. Harkins, the companion of Mrs. Woodland, who was the mother of Mrs.

Hearn. These salaries were at the rate of twenty-eight and fifteen dollars per week, respectively. As the directing head and guiding spirit of the company, Mr. Hearn seems to have successfully conducted the business until December 20th, 1928, the date of his death. He left a will dated April 26th, 1916, by which he devised and bequeathed all property of which he was possessed at the time of his death to his wife, Effie J. Hearn, and his sister, Mary C. Hearn, the complainant in this cause, share and share alike. These two beneficiaries were named as executrices by the testator, and released from the obligation of giving bond. Shortly after his death, the will was lodged with the register of wills of Baltimore City by a Masonic friend of the deceased, in whose custody it appeared to have been since the date of its execution. It was thereupon admitted to probate. On December 28th, 1928, Mary C. Hearn renounced her right as executrix, which renunciation was filed on the following day, and on the same date letters testamentary were granted to Effie J. Hearn, the widow and remaining executrix. Two days later a special meeting of the stockholders of the National Window & Office Cleaning Company was called, which meeting Mrs. Hearn, the executrix, attended, and she voted the 2,457 shares of stock then standing in the name of her husband. All other outstanding shares were either represented in person or by proxy, and by unanimous vote Mrs. Hearn was elected president at the same salary, of $400 per week, which her husband had previously drawn. The salaries to the chauffeur and companion, as above stated, were continued and regularly paid by the company until the death of Mrs. Harkins, when payments as to her ceased. In addition to this the chauffeur was donated Christmas presents costing fifty-one dollars paid by the company, in line with the previous custom of Mr. Hearn.

Mrs. Hearn continued to receive the above salary as president until February 18th, 1933, when it was reduced to the sum of $300 per week, and she continued to receive this latter sum until the date of her death,

which occurred on August 20th, 1933. She left a will, which was probated in the Orphans' Court of Baltimore City, and on August 31st, 1933, letters testamentary upon her estate were granted by said court to Richard B. Adams, the executor named in said will. It appears that Richard B. Adams was the attorney for Walter A. Hearn and his company at the time of the latter's death. At that time he was consulted by Mrs. Hearn and employed by her as her adviser in closing the estate of her husband. The interval which elapsed between the deaths of Mr. and Mrs. Hearn was four years and eight months. During that time no administration account was filed or passed by the executrix in her husband's estate, and the certificate of stock in the company pertaining thereto remained in the name of her husband at the time of her death.

Acting in his capacity as executor of Mrs. Hearn, Richard B. Adams attended a special meeting of the National Window & Office Cleaning Company on October 4th, 1933, and assumed to vote, on behalf of the estate of his testatrix, the 2,457 shares of stock in the company belonging to the estate of Mr. Hearn. At that meeting the other outstanding shares were represented and voted, resulting in the election of George W. Sparks as president and treasurer of the company, and the said Richard B. Adams as director. Mr. Sparks was vice-president at the time of the death of Mr. Hearn, and continued in that position until his election as president. At the time of the meeting on October 4th, 1933, no letters of administration d. b. n. c. t. a. had been granted upon the estate of Walter Hearn.

Under the presidency of Mrs. Hearn a dividend of ten dollars per share on the stock of the company was declared on February 4th, 1929, and a second dividend of two dollars per share was declared on March 2nd, 1931. The former dividend was applied by the executrix towards the payment of an indebtedness of thirty-eight or nine thousand dollars, due by Mr. Hearn to the company at the time of his death; the executrix making up the dif-

ference between the dividend and the amount due the company by her decedent, and cancelling the entire debt. One half of the second dividend, or $2,457, was paid to Mary C. Hearn and the other half retained by the executrix, the co-beneficiary, under the will of Walter A. Hearn.

According to the testimony of J. Leon Bozman, a public accountant who audited the books of the company, salaries were paid to those mentioned above during the period covering from January 1st, 1929, to August 20th, 1933, as follows:

To Mrs. Hearn, President.............................................$94,000.00
To William Ellis, Chauffeur (including cost of
    Christmas gifts) ................................................. 6,035.00
To Mrs. Harkins, Companion and Nurse............. 3,210.00

    Total ................................................................$103,245.00

As an offset against the above sum, the chancellor has allowed the estate of Mrs. Hearn the sum of $2,089.80, shown to have been paid by her, out of her personal resources, to the Internal Revenue Department as additional income taxes assessed against the company.

It is shown that Mr. Hearn was married many years ago and formerly lived on West North Avenue in Baltimore City, at the home of his mother, where also Mary C. Hearn, his sister, resided. Later the mother died and Mr. Hearn purchased a home at 3615 Forest Park Avenue, to which he moved. He had no children, and the family consisted of himself, his wife, and sister, to whom he was devoted. In 1918, the family circle was augumented by the addition of Mrs. Woodland, the mother of Mrs. Hearn, and Lucy Margaret Woodland, a niece. They lived in comparative luxury as one happy family upon resources furnished entirely by Mr. Hearn up to the time of his death, and after his death the same standard of living was maintained by Mrs. Hearn for the four remaining occupants of the home out of the salary which she received from the company, the same servants and service being retained. Mrs. Woodland died, and, upon

the death of Mrs. Hearn, the complainant and Lucy Margaret Woodland were left alone.

The complainant was about seventy-nine years of age when her brother died, and since then has failed in health. Her condition has gradually grown worse. At one time her case was diagnosed as cancer, but this appears to have been an erroneous diagnosis. She is now in the eighty-sixth year of her age and her testimony, as revealed by the record, leads to the conclusion that her mental faculties, and especially her memory, are appreciably impaired. This is obvious from the variance between the allegations set forth in the bill of complaint, which she swore to, and the gist of her testimony.

The maid, employed as a companion to Mrs. Woodland, upon the death of the latter was retained as a companion to Miss Hearn until her condition required a more experienced nurse, and, when this requirement developed, successive nurses were specially employed. The complainant was confined to her rooms most of the year previous to the death of Mrs. Hearn. During all the period of her disability she was regularly attended by her cousin and family physician, Dr. Hearn, who saw her almost daily. Like most family physicians he had her confidence, and the following excerpts from his testimony are pertinent. "Q. After Walter died, did Miss Mary complain for the first year or two? A. Well, not the first year or so, I don't think there was much complaint, but things seemed to get worse as time went on. Q. What did she complain about? A. Well, of this nervous condition, she always was afraid to go out or to see anybody. Q. You knew that Mrs. Hearn was president, didn't you? A. Yes, she told me she was made president after Walter's death. Q. Did you suggest to her, (Miss Mary), that she would go out in the car some time and get a power of attorney signed and put it into some one's hands to look after her affairs for her? A. I told her she ought to have some one looking after her affairs, that there wasn't anyone representing her in the business at all, that I had seen cousin Walter's will and she was left half owner of his estate, and she had not received any benefit from it, as far as I

knew, and she said she hadn't. Q. When had you seen the will of Walter? A. I went down to the Court House Q. When did you go down? A. That was after Effie's death."

It will be seen from the above that the complainant was in a nervous state the year preceding the death of Mrs. Hearn, that she was, however, always in touch with her cousin and doctor, and that Dr. Hearn knew Mrs. Hearn was president of the company, but as her confidant did not view the situation in Walter Hearn's estate with apparent alarm until after the death of Mrs. Hearn.

There is a mass of conflicting testimony in the record bearing on the treatment which the complainant received from Mrs. Hearn after Walter's death, but a careful analysis of the same leads to the conclusion that there was no difference in the environment which surrounded the complainant between the date of his death and that of his wife, except in so far as that environment was naturally affected by the loss of a loving and faithful brother.

The real change in the home circle came to a climax when Mrs. Hearn died. The ruthless hand of death had then claimed all of the family membership except the complainant and Lucy Margaret Woodland, a woman many years her junior. Miss Hearn was in bad health. She was under the constant care of Martha L. Favorite from the latter part of January, 1933, seven months before the death of Mrs. Hearn, and she has continued to be her nurse. It was this nurse, in our opinion, who caused a breach between the complainant and Lucy Margaret Woodland, resulting in the latter's removal from the house on March 1st, 1934. Prior to the last mentioned date, there is every evidence of existing friendship and love between the complainant and Miss Woodland. And even on the night of March 1st, 1934, when Miss Woodland, piqued by criticisms coming from Miss Favorite, decided to leave her once happy home and go to live with her uncle and aunt, she was thoughtful enough to kiss Miss Hearn goodbye, and to get her uncle

to spend the night at the house she had left, so as to lend protection to the complainant. Again there is much testimony in the record directed to the end that there was a deep-seated conspiracy formulated between Mrs. Hearn and Richard B. Adams, her attorney, for the purpose of defrauding the complainant and extracting from her that part of her brother's estate which was justly due her. This testimony, however, is more than offset, we think, by testimony to the contrary, which indicates that Mrs. Hearn died with naught but a deep interest in the complainant in her heart, and this thought is strengthened by a perusal of her will, in which she directs that a space in the family burial lot be reserved for the remains of Miss Hearn; "it being the intention that the lot shall be the resting place of my said husband and his sister and myself alone."

The will further requests that Lucy Margaret Woodland continue to maintain the home at 3615 Forest Park avenue for herself, Lucy I. Woodland, the mother of the testatrix, who was then living, and Mary C. Hearn, as long as they, or the survivor, might live. It was executed October 30th, 1930, nearly two years after the death of Walter Hearn, and, in spite of all the testimony found in the record tending to prove hatred, malice, conspiracy, and fraud toward her sister-in-law, the complainant, it was not changed during the period of nearly three years after its execution and before the death of testatrix. It stands out, therefore, as a silent, unimpeachable witness in behalf of the testatrix, at an hour when her memory is assailed and her own lips are sealed.

After the death of Mrs. Hearn, Lucy Margaret Woodland was paid the sum of $100 per week for the maintenance of the Forest Park house until March 1st, 1934, and Miss Hearn was paid for two weeks the sum of $50 and later the sum of $55 per week; these sums being paid by the company upon the order of Richard B. Adams. From Miss Hearn's allotment, she voluntarily paid to Miss Woodland the sum of $20 per week for board of herself and nurse.

The testimony shows that Miss Hearn executed a will shortly after her brother's death, devising all property belonging to her to Mrs. Hearn; later she executed a codicil to this will making Lucy Margaret Woodland the contingent beneficiary in event of the death of Mrs. Hearn before the death of the testatrix. Both the will and the codicil were drawn by Richard B. Adams; he states they were drafted at her request and under her direction. In her testimony she now repudiates the will and codicil and states that they were executed by her as a result of a conspiracy to defraud her on the part of Mrs. Hearn and Adams. She also denies any knowledge of signing a renunciation as executrix of the will of her brother, and alleges that if such paper was executed by her it was a result of the alleged conspiracy above noted.

Such is the status of her testimony, Miss Hearn being at this time, as hereinbefore stated, nearly eighty-six years of age and having been under the constant care of Miss Favorite since January, 1933. It was Miss Favorite who introduced Dr. Hearn to her own personal attorney, and it was through the activity of the doctor and the nurse that a new will was made by Miss Hearn and the bill of complaint in this cause filed.

That there was unreasonable and inexcusable delay in passing an administration account in the estate of Walter A. Hearn is self-evident; and in this respect, Mrs. Hearn, if she were living, would be subject to criticism. At the same time, however, it should be noted that, as far as the record goes, there is no evidence whatever that either Mrs. Hearn or Mr. Adams profited by the above delay, or that Mr. Adams has received any compensation for such professional service as he may have rendered. The only two dividends declared by the company during the presidency of Mrs. Hearn were properly applied. The attorney received none of these dividends and his client, the executrix, received no larger share of them than did the complainant.

As before stated, the bill of complaint seeks to establish a conspiracy to defraud, and in this respect we think the testimony is wanting.

The bill of complaint further seeks to charge the estate of Mrs. Hearn with one-half of the sum of $103,245, hereinbefore set forth, and the learned chancellor, by his decree, has charged one-half of said sum against the estate of Mrs. Hearn, less, however, the $2,089.80 paid to the Internal Revenue Department by Mrs. Hearn; the decree further providing that Miss Hearn be charged at the rate of ten dollars per week for board for herself from the date of her brother's death to the date of Mrs. Hearn's death, and at the same rate for board for her special nurses, which is ascertained by the chancellor to amount to the sum total of $2,918.56. As a result of the above figures the decree against the estate of Mrs. Hearn is for the sum of $47,659.04, and interest is awarded from the date of the decree. It is from that decree that this appeal is taken.

It will be seen by an analysis of the above figures that the chancellor has entirely eliminated any compensation whatever to Mrs. Hearn for her services as president of the company; has charged Miss Hearn at the nominal rate of ten dollars per week board for herself and special nurses, without taking into consideration the services which were rendered to her by the chauffeur, and, after the death of Mrs. Woodland, the special services which salaried nurse rendered to the complainant. And what is more significant, assuming that the chancellor was right in denying any compensation to Mrs. Hearn as president of the company, the decree charges her estate with the entire sum received by her as salary plus the sums paid the chauffeur and nurse, and seeks to divide it equally between the complainant and the estate of Mrs. Hearn, without taking into the equation any consideration whatever of the interest of the holders of the forty-three outstanding shares of the company. With these conclusions, and with great deference to the chancellor, we cannot agree.

At the expense of prolonging this opinion we have detailed the testimony in this cause; we come now to the legal questions involved.

Counsel for the respective parties have devoted the greater part of their carefully prepared briefs to the questions of conspiracy to defraud, and consummated fraud on the part of Effie J. Hearn, the executrix, and Richard B. Adams, her attorney, on the one hand; and laches, limitations, acquiescence, and ratification, as applied to the complainant, Mary C. Hearn, on the other. In view of our conclusion, however, we deem it unnecessary to consider the several questions above raised, first, because, as stated above, we find the facts in this cause void of conspiracy and fraud; and, secondly, because we find from these facts that the complainant intrusted the entire administration of her brother's estate to her sister-in-law, and enjoyed the emoluments therefrom in equal degree with other members of her brother's family. Under such circumstances, we cannot apply the doctrines of laches and limitations against her; but by the same token we hold that she intended to acquiesce in and ratify, and did acquiesce in and ratify, all acts of the executrix pertaining to the administration of her brother's estate, which were void of ulterior motive, design, or fraud, and of course she would not be bound by any acts performed by the executrix effected with the latter design.

The remaining questions involved are: First. Is the estate of the executrix now accountable to the complainant for one-half of the sum total of the salary the executrix received from the company, and the salaries paid the family chauffeur and nurse by the company (less the income tax which she individually paid on behalf of the company), under all the facts in this cause? Second. Can relief, if any she has, be granted to the complainant, without making the National Window & Office Cleaning Company a party to this cause, under all the facts in said cause?

As to the first query it will be recalled that Mrs. Hearn was elected president of the company by a unanimous vote of all the outstanding stock. This result was accomplished by the vote of 2,457 shares which she cast as

executrix of the estate, and in which she had a one-half interest, and by the vote of the remaining forty-three outstanding shares, all of which were cast in her favor. Upon the legality of her election as president depends the legality of her own salary, and the payments made to the chauffeur and nurse.

The authorities are in accord in laying down the principle that a fiduciary will not be allowed to profit by virtue of his position. The rule is necessary for the safeguarding of all trust estates, and without its application temptations would constantly confront fiduciaries, which would inevitably lead to a conflict between the interests of the fiduciary and the interests of the *cestui que trust.* It is based upon the divine injunction that no man can serve two masters, and the rule applies alike to agents, partners, guardians, executors, and administrators, as well as trustees. *Perry on Trust and Trustees* (6th Ed.) sec. 427; *Lewin on Trust and Trustees,* p. 275; *Pomeroy's Equity Jurisprudence* (4th Ed.) vol. 3, sec. 1077.

In the recent case of *Mangels v. Tippett,* 167 Md. 290, 173 A. 191, Richard B. Tippett and the Safe Deposit & Trust Company of Baltimore were appointed trustees to hold in trust, for the purposes set forth in the will of Bernard M. Mangels, all the stock which the testator held at the time of his death in the Mangels-Herold Company. At the time of the death of Mangels the total outstanding stock of the company was 2,500 shares, of which Mangels held 1,250 shares, and Herold the remaining 1,250 shares. Shortly after the death of Mangels, his wife, the executrix named in the will, qualified, and a few days after her qualification, and before any administration on the estate was effected, the certificate of stock being then in the name of the testator, Mrs. Mangels executed a proxy to the said Richard B. Tippett, who attended the annual meeting of stockholders of the company, and at said meeting, among other proceedings, voted the 1,250 shares of stock in unison with Mr. Herold, who also voted 1,250 shares, whereby Herold was elected a director and president, and Tippett a director and sec-

retary, of the company. Tippett's salary was fixed at fifty dollars per week.  Upon a petition filed in the Circuit Court of Baltimore City, seeking the removal of Mr. Tippett as co-trustee, and an accounting for one-half of the salary paid him as secretary to the company, this court said: "It is of no concern whether or not the services rendered be fully worth the salary received.  It still remains true that that personal benefit to him is derived by virtue of his trusteeship.  There can be no question that the net return to the estate is lessened by one-half of the amount of the salary received by Mr. Tippett as secretary; and he is in a situation, as trustee, to use such position for personal gain at the expense of the estate. We find no evidence in this record which indicates that his services as secretary have been overpaid, or that any other person occupying that position would not be entitled to and receive as much or more salary. But, as stated, this can have no influence upon the application of the principle here invoked.  He might as easily have demanded and received a very much larger salary, in return for voting an unreasonable salary to Mr. Herold, the president and treasurer; and it is apparent that his self-interest and the interest of the estate which he represents as trustee may conflict, to the detriment of the estate. We desire to make it clear that we find no evil intention, purpose or design on the part of Mr. Tippett; but the facts show a case governed by the principle laid down by the authorities, and, if that is to be maintained in its full force and integrity, we feel compelled to apply it to the present facts."

It will be noted, from the above quoted extracts, that a distinction is drawn between cases wherein the fiduciary is elected to a position of profit in a corporation by voting stock pertaining to his trust estate, without the vote of which he could not be elected, and cases wherein stock pertaining to the trust estate is not necessary for his election.  In other words, in the *Mangels* case there was no outstanding balance of power, and Tippett could not have been elected a salaried secretary of the com-

pany without voting at least a part of the trust stock. Such a state of facts, however, was not present in the cast of *Dailey v. Wight,* 94 Md. 269, 51 A. 38. In that case John H. Wight was, by the will of Edward Hyatt, appointed trustee to hold sixty-seven shares of the capital stock of the Sherwood Distilling Company. The total outstanding stock of the company was three hundred shares, of which John H. Wight owned one hundred individually; he also owned another seventy-five shares jointly with his brother William H. Wight, who held individually twenty-five shares. After the death of Hyatt, John H. Wight had himself elected as president of the distilling company, and then had himself voted a salary of $10,000 a year, although Hyatt never received any salary as president. William H. Wight, a brother, was elected secretary and treasurer of the company, at a salary of $5,000, although his predecessor in office had never received a salary. The company did not pay as large dividends as before, and, since John H. Wight had become president, had passed dividends for two years. Nevertheless, this court held, speaking through Chief Judge McSherry, that the election of John H. Wight and the receipt by him of the salary was in no way a violation of his fiduciary position. It will be noted that John H. Wight owned one-third of the total stock individually, and in order to obtain a majority thereof he needed either the stock held by him in trust or that which was held jointly by him and his brother, who was also elected an officer at a large salary. This court thus recognized that when one can, by the use of his individual ownership, added to that of his friends, control the majority of the stock of the corporation, the fact that he also holds other shares as a fiduciary is immaterial, saying, 94 Md. 269, at page 276, 51 A. 38, 40: "So it is perfectly obvious that the sixty-seven shares held in trust, constituting, as they do, but two-ninths of the whole number of shares, were not needed to give the appellee, with his own holdings, a majority to carry the resolution voting to himself a salary. And as the owners of two hundred and thirty-three

shares, and the equitable owner of seventeen shares, making two hundred and fifty out of the whole three hundred shares, are content and satisfied that the appellee should receive the salary he now draws, it is far from accurate to say that the voting of the salary was 'an obvious breach of his duty as trustee.' "

In the *Dailey v. Wight* case, *supra,* this court recognized the equitable principle that a fiduciary cannot make a profit out of his position, but held as controlling, in determining that no breach of fiduciary duty had been committed, the fact that John H. Wight was elected president of the company and voted a salary without the necessity of voting the stock held by him in trust. It is not clear from the record whether John H. Wight voted the sixty-seven shares held by him as trustee. He may, or he may not, have voted them; in point of fact they were not a controlling factor, if, as was the case, a majority of stock from other sources was available and voted for the election of the trustee as president, at the fixed salary above set forth.

It is observed that the next above case is distinguishable from the *Mangels* case, *supra,* in that in the *Mangels* case it was necessary for Richard B. Tippett, the trustee, to vote at least a part of the stock he held in trust, in order to be elected as director and secretary—there was no other outstanding balance of power.

The instant case, however, is analogous to the *Dailey* case, *supra,* in that, regardless of whether all of the stock belonging to the estate of Walter A. Hearn was voted by the executrix to elect herself as salaried president of the company, she was the equitable owner of one-half of the 2,457 shares standing in the name of her husband, and the record shows that she received, in addition to the votes which in any event she had a right to cast, the forty-three votes of the remaining outstanding shareholders. It might be added that the right of the executor to vote the stock of his testator, during the course of administration, is recognized in the *Mangels* case, *supra.*

If, as was the fact, Mrs. Hearn individually owned and controlled 1,228½ shares of stock, and if, as was the fact,

forty-three shares of outstanding stock augumented her individual vote, it follows that she could have been elected president without the necessity of casting a single vote of the stock equitably owned by the complainant, and that the casting of the votes impressed with the trust was nothing more, nor less, than an act of indiscretion on the part of Mrs. Hearn, which did not, in the last analysis, prejudice the rights of the complainant.

As was so forcibly stated by the late Chief Judge McSherry in the *Dailey v. Wight* case: "If the examination of a question of fact be approached with the preconceived conviction that fraudulent conduct is hidden somewhere behind it, it is altogether likely that an entirely false coloring will be involuntarily given to perfectly innocent transactions. The assumption that fraud has been practiced, and the assumption of this in advance of an actual knowledge of the facts really existing, is often apt to mislead the judgment of the otherwise cautious investigator when he comes to the consideration not of the supposed, but of the actual, events and occurrences, and thus frequently 'trifles light as air' become 'confirmations strong as proofs of holy writ.'"

In the light of the serious allegations found in the complainant's bill of complaint, we have approached the task before us. As hereinbefore indicated, we have discovered inexcusable delay in the administration of the estate of Walter A. Hearn, but, fortunately for the defendant's estate, we have found no element of conspiracy or fraud. The business of the National Window & Office Cleaning Company was conducted up to the time of the death of Walter A. Hearn practically as a one man corporation, and the lucrative salary which he received, as well as his dividends, was expended in maintaining a home, not alone for his wife, the now deceased executrix, but alike for the complainant, his sister, Mary C. Hearn. What Mrs. Hearn did was to carry on and maintain the comparative luxury which each member of the household enjoyed when her husband died. She did this through the same policy which he had pursued; and, in carrying out

the fixed design of her husband, it is apparent that she had the co-operation and approval of the complainant.

Our conclusion being that the election of Effie J. Hearn as president of the company was legal, it follows that the compensation which she drew, and the compensation which the chauffeur and nurse drew, under the authority of the president, were likewise legal, and that the complainant is not entitled to relief.

For the reasons stated, it is unnecessary to here discuss what we have indicated as being the second important question involved, namely, the necessity of making the National Window & Office Cleaning Company a party to this suit.

*Decree reversed, and bill of complaint dismissed, with costs to the appellant.*