# SCHMIDT ET AL. *v.* CHAMBERS ET AL.

[No. 186, September Term, 1971.]

*Decided March 14, 1972.*

10

*Motion for rehearing filed April 13, 1972; denied May 8, 1972.*

The cause was argued before HAMMOND, C. J., and MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*J. William Treuth, Jr.,* and *C. Victor McFarland,* with whom were *Treuth & McFarland* on the brief, for appellants.

*Richard C. Murray* and *Claude A. Hanley* for Daniel B. Chambers, Jr., one of appellees. Submitted on brief by *G. Warren Mix* for intervening stockholders, other appellees.

FINAN, J., delivered the opinion of the Court.

This appeal represents the consolidation of five cases, the nature of which will be shortly discussed and all of which proceedings arise from the execution of the provisions of the Last Will and Testament of George J. Schmidt, deceased (Testator), dated December 14, 1964. The Will provided that Mamie I. Schmidt, the widow (widow), one of the appellants, and Daniel B. Chambers, Jr. (Chambers), one of the appellees were to be co-executors. Other provisions of the Will created two trusts with Chambers as trustee for both, together with spendthrift provisions for the widow. It was further provided in the Will that the trusts should cease upon the death of the widow and the funds remaining be divided between the two daughters of the deceased, namely, Gladys C. Albiker and Charlotte I. Fonda, the other appellants. This brief recital outlines the various interests of the parties in the Schmidt estate and of itself presents a simple picture; however, this is merely prologue. It is the manner in which these interests and the administration of the estate are affected by the complicated business holdings of the Testator, with which we must come to grips. This requires us, unfortunately, to thread our way through an intricate maze of facts.

## THE FACTS

The Testator at death owned 764 shares of the John C. Louis Company (the Louis Company) which represented 37% ownership of the stock. He was at that time

the chairman of the board and chief executive officer of the company which may be described as a closely held corporation. The Louis Company was, and is, a dealer in heavy construction equipment. The year prior to the Testator's death it had enjoyed sales in excess of $4,-000,000 and the year before that $2,600,000. For some years the stock had been subject to certain "buy or sell" or voting trust agreements, the details of which will be later discussed. Also, at the time of death, the Testator owned 50% of the capital stock of Westport Machinery Company (Westport), which company was utilized to handle the used or "trade-in equipment" of the Louis Company. The Testator had also, at one time, owned 50% of the stock of the Schmidt-Phillips Realty Company (Schmidt-Phillips). The assets of this latter company consists of real estate leased to the Louis Company. Schmidt-Phillips had 360 shares of stock outstanding at the time of the Testator's death, 180 of which were owned by the Phillips family, who were also stockholders in the Louis Company and Westport, and 175 shares of which had been transferred to Mrs. Schmidt and 5 shares of which were in the Testator's name. At one time the wives of George J. Schmidt and Lewis T. Phillips each received a $300 monthly salary from Schmidt-Phillips Company but this payment, as to the Testator's widow, was terminated in 1970.

We must now turn the clock back to November of 1952. At that time the Testator, his brother, and Lewis T. Phillips were the sole stockholders of Louis Company. These gentlemen entered into two agreements, one of which was the first stock "buy-back agreement" and which in substance required the personal representative of any of them to offer stock to the Louis Company with a requirement for the Company to purchase the same. It was further provided that if the Louis Company had insufficient surplus for that purpose, or could not reduce its capital to that extent, then the survivors had an individual obligation to consummate the purchase. On the same date the parties entered into a so-called salary con-

tinuation plan, whereby, in the event of the death of any of them, the widow would receive 50% of the husband's annual basic salary. However, the lower court in its opinion found that the subsequent actions of the Testator and Lewis T. Phillips, after the death of the Testator's brother, at which time they ignored this latter provision, constituted a mutual and voluntary rescission of the so-called pension plan. No appeal was taken from this ruling and we need not further concern ourselves regarding it.

During 1957 the Testator and Lewis T. Phillips became the equal owners of all outstanding shares of stock of the Louis Company. The Testator was in ill health for almost 15 years prior to his death and Mr. Lewis T. Phillips revealed some anxiety over his ability, or that of the Louis Company, to purchase the Testator's stock in the event the latter predeceased him. Accordingly, they both incorporated language in their Wills which provided for the designation of a trustee who would have authority to "make, alter, or change" any stock buy-back agreement. It should also be noted that both the Testator and Lewis T. Phillips were haunted by the fear that some of their stock in the Louis Company might have to be sold to outsiders to provide sufficient money with which to pay the anticipated federal estate taxes. This thought was not infrequently discussed between them and Chambers who eventually became personal counsel for both of them, as well as general counsel of the Louis Company. Indeed, one might gain the impression that they may have been overly impressed by the words of King Richard, "Let's choose executors and talk of wills." *Shakespeare, King Richard the Second,* III 2.

As the business of the Company expanded both the Testator and Lewis T. Phillips realized the benefit to be gained by selling stock in the Louis Company to key employees so as to maintain a high level of employee morale and to stimulate their interest in the future of the Company. In order to do this and still maintain management control, the stock buy-back agreement was rescinded and

the device of a voting trust agreement was employed. In 1959 the first of a series of such agreements was executed. The cardinal provision in all of the various voting trust agreements was that in the event of the death of a holder of a voting trust certificate, the Company was obligated to repurchase his certificates at "book value" determined by "the certified public accountant then servicing the Company." In the event of the death of one of the major stockholders (the Testator or Mr. Lewis T. Phillips) the purchase price was to be payable over a period of eight years with interest at the "current bank rate" on the unpaid balance. Shortly thereafter, 70 additional shares of stock were sold to some 4 employees at a price of $600 per share, and by June 15, 1969, employees had invested a total of $77,000 in stock purchases. These employees became parties to the voting trust. Some of these employees appeared as intervenors below and are now among the appellees.

As fate would have it, however, it was not Schmidt, the ailing corporate officer who died first, but, rather, Lewis T. Phillips, who passed away on June 1, 1962. The Testator immediately took the position that the Louis Company could not afford to purchase Phillips' certificates and the corporate minutes of June 3, 1962, reflect the intentions of both the Testator and William B. Phillips, the son of the then recently deceased Lewis T. Phillips, that the existing voting trust be terminated. This was accomplished by executing a new voting trust agreement on September 15, 1962. This latter agreement was to run until 1972 and provided that in the event of the Testator's death, either the Louis Company or William B. Phillips or Agnes Phillips (widow of Lewis T. Phillips) would be obliged to purchase the Testator's stock. The provisions as to the determination of the value of the stock and the manner of payment, as provided in the previous voting trust, were retained. Chambers was named as an alternate voting trustee to succeed the Testator, in the event of his death. It further appears from the record that in consideration of the widow of Lewis

T. Phillips forebearing from demanding that the Louis Company repurchase her husband's stock, the Company agreed to pay her $6,000 per annum, which the Company rationalized was less than the interest it would have to pay on the money it would have had to borrow in order to purchase her stock.

During the year 1963 some 19⅔ shares of stock were sold by the Louis Company at $700 per share to two individuals and on December 16, 1963, a 200% stock dividend was declared.

A supplemental voting trust agreement was executed on November 30, 1964, which retained the provisions of the former one except it extended the time for the payment of the Louis Company's obligation to purchase the stock of the major stockholders to eleven years instead of eight and provided that interest at the rate of 6% would commence "only at maturity" of the notes issued for payment "and not before." This supplemental voting trust agreement was approved by the directors and stockholders on December 11, 1964. In the meantime, additional stock had again been sold so that by the time of execution of this last agreement, over $110,000 had been invested by individuals other than the Testator and the Phillipses, and all stockholders were members of the voting trust.

The last meeting of the directors and stockholders, prior to the death of the Testator, was held on February 9, 1967. At that time the Testator was made chairman of the board (a new office) and chief executive officer and William B. Phillips was elected president. Chambers was continued in his capacity as general counsel. The Testator at this time was in very poor health. He died on March 26, 1967.

It is now time to review and assess the role of Chambers in this narrative. There is evidence that Chambers, a well qualified practicing attorney, first commenced handling small legal problems for the Louis Company as early as 1937, when he was a member of the Maryland Legislature; these were primarily tax problems and real

estate matters. However, it was not until 1956, when he represented the Testator's brother in a domestic matter and after the brother's death, that he became more familiar with the Testator through the representation of the brother's children in estate matters. Chambers had been consulted about the 1952 stock buy-back agreements although he did not prepare them, they being (literally) the work of a Philadelphia lawyer. Chambers did prepare wills for both Lewis T. Phillips and the Testator, and in 1956 he was elected a member of the board of directors of Louis Company to fill the vacancy created by the death of the Testator's brother. In January of 1962 he was designated as general counsel, a position referred to as an office. In January of 1965 the Louis Company authorized an annual retainer for Chambers in the amount of $3,000 making it retroactive for the preceding year.

Subsequent to the Testator's death on March 26, 1967, the Will was admitted to probate in the Orphans' Court for Baltimore County, which named Chambers and the Testator's widow as co-executors and Chambers as the sole testamentary trustee. The Will authorized Chambers, as trustee, "to enforce, comply with, and carry out" the stock repurchase agreements then in force with the Louis Company or in the alternative:

> "* * * to make, alter, change and in any other manner conditionally or absolutely, to dispose of all or any part of my capital stock * * * not in accordance with the provisions of the capital stock agreement referred to, if in his sole discretion such disposition of my stock is most suitable for the object and purposes of my estate, having in mind, the age and health of my wife at the time of my death."

Also in his discretion Chambers, as trustee, was authorized to retain stock owned by the Testator at the time of death.

The week following the Testator's death a meeting

was held at the home of the widow, Mrs. Schmidt, it being the first of several at which the matter of the Testator's estate was discussed. Mrs. Schmidt was anxious to return to California with her daughter, Mrs. Fonda. The accounts of these meetings differ in accordance with who is doing the narrating, but a fair summary reveals that Chambers never read the Will to the beneficiaries, but upon the second meeting left copies of it with the widow and the two daughters, and apparently left copies of the voting trust agreements. It would further appear that one daughter called him and requested that he not read the Will or at least that part wherein she as a remainderman stood to receive a greater percentage of the second trust than her sister, as she thought this might prove embarrassing and as apparently she would have preferred that her sister share equally with her. We do not view these variations in the details of these meetings as material. It suffices to say, that at these meetings Chambers gave a detailed history of the Louis Company; stressed that it was short of cash; indicated that with respect to the inventory of the estate he intended to ask the Orphans' Court to reduce the value of the Louis Company stock so as to reduce inheritance taxes and estate taxes; that he advised the widow that he had deleted from the inventory of the estate five shares of the stock of Schmidt-Phillips, but that this stock would be included in the inventory at a later date; that the Testator had personally guaranteed Louis Company loans at the First National Bank of Maryland and that he, Chambers, would endeavor to have this guarantee eliminated; and, that he hoped to arrange for the payment of the federal estate tax on an installment basis at 4% interest.

The record reveals that shortly after the Testator's death, the Louis Company voluntarily allocated the sum of $5,000 for the widow, payable at the rate of $250 per week; that it paid into the estate or paid bills on behalf of the estate in an amount in excess of $20,000, which represented satisfaction of accrued commissions owed to the Testator and that the widow received approxi-

mately $25,000 from various insurance contracts. The latter has nothing to do with the issues involved here, save to demonstrate that Chambers had some knowledge that the widow was not immediately bereft of funds. The testimony also shows that she had two residential properties, one in Baltimore and one in California, and that she had a loan of $25,000 from the Louis Company, secured by her stock in the Schmidt-Phillips Company, upon which she owed interest.

Of most importance, however, is the fact that at one or all of the meetings that were held after the Testator's death, and before the widow departed for California, Chambers made statements to the effect or in some manner gave the impression that the Testator's gross estate should be worth approximately $400,000 of which the Louis Company stock should account for about $240,387, at a value of $314.80 per share. This latter figure of $314.80 per share was repeated in a note sent by Chambers to one of the Testator's sons-in-law on June 17, 1967, and again on June 23, 1967, the Louis Company auditor, in a note to the widow, affirmed this figure. The figure used in the "Inventory" filed in the Orphans' Court in September of 1967 was slightly less, being $310 per share.

It would appear that for at least some months after the Testator's death there was no open breach between the widow, her daughters and Chambers. Both she and Chambers qualified as co-executors under the Will. Indeed on August 2, 1967, at a special meeting of stockholders and directors, Edward R. Albiker, one of the Testator's sons-in-law was elected a director to fill the vacancy caused by the Testator's death. At this same meeting Chambers offered a series of 12 non-negotiable promissory notes, which he had prepared for execution by the Louis Company, totalling $240,507.20, for the purchase of the Testator's stock from his estate, as provided by the voting trust, as amended. The first note would have been payable on January 28, 1968, and the second on July 28, 1968, and the remaining ten payable

on the 28th of July each year thereafter. He also presented a "second supplemental voting trust agreement" which he proposed should be executed by all the stockholders. He further stated he intended to obtain approval of the Orphans' Court for the sale of the Testator's stock to the Louis Company and at this same meeting he proposed that his salary be increased to $125 per week and that he be designated vice-president and general counsel. These suggestions were approved. The series of promissory notes of the Louis Company were executed by its president, Mr. William B. Phillips, and were turned over to Chambers who retained possession of them. We should at this point add, that the new supplemental voting trust agreement was never fully executed by all of the stockholders. It did recite, however, that some $44,565 of additional stock in Louis Company was to be sold at $251.84 per share and Chambers, himself, was listed as subscribing to 40 shares.

During the latter part of 1967 Chambers was successful in having the Testator's estate released from the personal guarantee made by the Testator on the Louis Company's loans with the First National Bank. This was accomplished in part by the Company's borrowing $125,-000 from its main source of equipment sales financing, the U. M. & M. Company. It had been the practice that on loans from this latter company, as well as on the First National Bank loans, that the lender always required the top officers of the Louis Company to add their personal endorsements to the loan, in addition to that of the Louis Company as maker. Chambers in his role as a new officer endorsed such notes with the U. M. & M. Company to the extent of $35,000.

We must now take a closer look at the fiscal affairs of the Louis Company. The Company seemed perennially to be in a short cash position. It was a common practice for it to be two years back in the payments of commissions to its salesmen. Yet, by and large it enjoyed a fair credit rating. The officers took substantial yearly salaries out of it and usually bonuses. As president, the Testator's

salary and bonus together had amounted to around $38,-000 to $40,000 annually. Several other officers received salaries and bonuses in the $22,000 range. The Testator instructed the auditor not to take as much depreciation and obsolescence on trade-in equipment as good accounting practices would normally have dictated and he was most reluctant to have the auditor charge off bad accounts. Indeed, one may gather from the proffered testimony of Louis Company's auditor, Mr. Bullough, a C.P.A., that approximately $30,000 in bad debts were being carried on the Company's books as of March 30, 1967, which should have been charged off; that one receivable in the amount of $168,000 was considered as "nil," and that inventory was overstated by approximately $80,000. If these conclusions were correct, an adjustment in the net worth of the company would have had to have been made in an amount in excess of $278,-000.

Although the Testator and Louis T. Phillips, as majority stockholders, in their lifetime, had visions of elaborate pension plans for their widows, and stock buy-back agreements to provide funds for the corpus of their estates, yet, in view of the continually low cash position of the Louis Company, these were unrealistic plans. This was proven at the time of the death of the Testator's brother, again at the death of Lewis T. Phillips, and now after the Testator's death the complications thus presented surfaced again.

Shortly after the Testator's death the Louis Company borrowed $75,000 from the First National Bank (at the time of the hearing on these matters in December of 1970 it owed $100,000 to the Bank). However, in order to accomplish this, the Bank required that an agreement be executed by the co-executor of the Testator's estate and the Louis Company whereby the series of notes payable to the estate by the Company for the Testator's stock be subordinated to the $75,000 loan being presently made. Also, there is testimony to the effect that the Bank

was given to understand that the funds of the Louis Company, which were to be required to purchase the Testator's stock, would be replaced in the Company's fiscal structure by the sale of new stock. However, although some new stock was sold, funds thus derived were never used for that purpose. Based on the record, there is no question but that the cash flow of the Louis Company was dangerously low for a corporation generating 3 million to 4 million dollars in sales volume a year. The record reveals that at any given time the Company had $425,000 to $475,000 in accounts receivable of which 72% were classified as current, or not beyond 30 days past due. The Company now endeavors to maintain cash in the bank near the $150,000 level at all times. When it sells equipment it is usually financed on time paper which is discounted with U. M. & M. Company of New York City. Frequently it must also carry trade-in equipment until there is an opportunity for resale.

The testimony relates how Chambers, by the month, became more enmeshed in the business of the Louis Company. He visualized its future prospects, made close personal attachments with its executives and salesmen and spent an ever increasing amount of his own time on corporate affairs. As we shall later mention, this was all well and good, and indeed was activity from which the Testator's estate may well have benefited, however, was this not imperceptibly but inexorably leading Chambers into a conflict of interests? For example, he was gradually arriving at the conclusion that it was unconscionable, insofar as the other stockholders were concerned, for the Louis Company to pay $314 per share for the Testator's stock to his estate.

Between the dates of August 2, 1967, when Chambers became vice-president and general counsel, to January 13, 1969, at which time he became chairman of the board and chief executive officer, he received several substantial salary increases, so that, as of the time of his testimony in the Fall of 1970 he was receiving a salary of $20,800

per year. He was also purchasing stock in the Company, as an example to other employees, thereby encouraging them to do the same, at a 20% discount from a value established from time to time by the board of directors. In this interim, however, through Chambers' efforts the sales of the Company improved, the cash flow materially increased, total salaries were reduced and outstanding commissions due salesmen were reduced from $177,000 to $70,000, and according to Chambers the net worth of Louis Company increased from $653,800 as of March 31, 1967 to $754,404 as of December 31, 1969. Understandably, however, the Testator's widow and her daughters were deeply concerned over the failure of the stock repurchase agreement to be productive of any payments to the estate and up to the time of the hearing in the circuit court none had been made.

As early as December of 1967, the widow, not having received any payments on the stock repurchase notes, had consulted legal counsel other than Chambers. This was in the person of J. William Treuth, Jr., Esq. (Treuth), for whom Mrs. Albiker (Testator's daughter) works as a secretary. The dissatisfaction of the widow regarding the administration of the estate was communicated to Chambers and several meetings were held with Treuth regarding the problem. At one point, Treuth proposed that he be appointed a co-trustee of the estate but nothing came of this. Matters deteriorated thereafter and litigation was triggered when Chambers, on June 14, 1968, filed a petition in the Orphans' Court to revalue the stock in Louis Company. This petition was ultimately dismissed by the Orphans' Court from which decision Chambers appealed to the circuit court. This was followed four days later by the widow's bill in equity (No. 62101) against Chambers and the Louis Company in which she pressed a claim under the salary continuation agreement in the amount of $38,000 (representing one-half of Testator's salary for two years) ; a claim for commissions allegedly owed the Testator in the amount of $22,000; a reimbursement for taxes deducted from

the $5,000 widow's benefit paid her by the Company; the removal of Chambers as co-executor and trustee under the Will; a declaration that the voting trust agreement of September 15, 1962, and the amendment thereto of November 30, 1964, under which Chambers voted the stock in Louis Company owned by the estate, be considered as null and void and a request that an auditor be appointed to "valuate" the stock. Louis Company demurred to this bill of complaint and the demurrer was sustained. On November 15, 1968, an amended bill was filed against Chambers alone, alleging the same items as the first but adding a claim for five shares of Schmidt-Phillips stock and requesting an accounting from Chambers, including certain emoluments received by him. The remaindermen of the trust estate were subsequently also joined as complainants.

Next, on November 22, 1968, the Louis Company filed an action in equity seeking a determination of the rights of the widows under the salary continuation agreement executed November 26, 1952. This was Law Case No. 73729.

On December 5, 1968, the widow filed a "Complaint For Removal of Co-Executor" in the Orphans' Court of Baltimore County. After a hearing the Orphans' Court removed both co-executors. The widow filed an appeal directly to the Court of Appeals that was later dismissed. Chambers filed his appeal to the Circuit Court of Baltimore County. On December 15 Judge Proctor affirmed the removal of Chambers as a co-executor. On May 22, 1970, the widow filed a "Motion to Rescind Order of Court Under a Mistake of Fact," in the Orphans' Court. This motion was granted and she was reinstated as a co-executor. Chambers appealed from this decision to the Circuit Court, and Judge Proctor affirmed the decision of the Orphans' Court reinstating the widow as sole executrix of the estate. Chambers has appealed the decision to this Court.

The warring factions had girded for battle and a meeting of the stockholders of the Louis Company was held

on January 13, 1969, wherein it was proposed among other things that the signatories to the voting trust agree that "legal action be taken against the heirs of George A. Schmidt, seeking an injunction against further suits either against the company or for the removal of Daniel B. Chambers, Jr. as sole trustee of the trust established by the Will of George A. Schmidt." At this same meeting Edward Albiker, son-in-law of the Testator, was replaced by the auditor Bullough as a member of the board of directors. As was noted by Judge Proctor in his well reasoned opinion:

> "* * * This agreement definitely drew up the battle lines [actually they had been drawn some months previously], the Company on one side and the heirs of George A. Schmidt on the other. * * * By paragraph 3H, it was agreed, 'That the by-laws of the Company be amended to re-establish the office of Chairman of the Board and Chief Executive Officer and that Daniel B. Chambers, Jr. be elected by the Directors of the Company to this office.' By this paragraph Chambers (charged with responsibility of enforcing the stock purchase agreement, as Trustee under the Will) became captain of the Company army, dedicated to seeing that the Schmidt troops did not get their just desserts under such agreement."

In an effort to simplify the proceedings, considering the number of suits involved and that some were filed on the law side of the Court and some in equity, counsel requested a pre-trial conference which culminated in a pre-trial order filed on September 22, 1970. The order recited the status of the various cases and the agreement of counsel that Equity Case No. 62101 and Law Case Nos. 73729, 72791, and 77859 be tried jointly. Since the cases could not be consolidated technically, counsel stipulated and the Court ordered that they be tried jointly before one judge to be decided in accordance with the law applicable to each.

## THE DISPOSITION OF THE CASES BELOW

The trial of these cases lasted six days followed by submission of memoranda and argument. Judge Proctor's holding may be summarized as follows:

1. In Law Case No. 72791 (concerning the Louis Company stock valuation) the court held that the Orphans' Court was wrong in dismissing the petition to revalue on the ground that it had only been signed by one executor. The court continued in connection with the stock valuation dispute by ruling that the accountant for the Company should prepare a "certified audit of the Company as of March 31, 1967" to reflect stock value.

2. With respect to Equity Case No. 62101 (the widow's bill to remove Chambers as trustee, etc.) the court concluded that Chambers "has been wearing too many hats" and that there was a conflict between his duties as chairman of the Louis Company and its chief executive officer, his duties under the voting trust agreement and his duties as testamentary trustee. For that reason, the court determined that he should be removed as testamentary trustee and should account for certain salary increases and stock purchases made by him. The court likewise ordered that Chambers relinquish his directorship in the Schmidt-Phillips Company as he had shown an adverse interest to that of the Testator's estate.

3. As to Law Case No. 73729 (the suit filed by the Company for a declaratory judgment concerning the salary continuation agreement) the court determined that the agreement was rescinded and had no force and effect at the time of Mr. Schmidt's death. No appeal was taken from this ruling.

4. In Law Case No. 77859 (the widow's petition

originating in the Orphans' Court to remove Chambers as a co-executor), the court determined to remove him for the same reasons as stated in Equity Case No. 62101.

5. In Law Case No. 79318, the court affirmed the Orphans' Court's reinstatement of Mrs. Schmidt as Executor.

6. The court also held that the five shares of stock in Schmidt-Phillips were assets of the estate on the theory that the Testator had intended to give these to his wife but that he had died before this gift was completed. There was no appeal taken on this issue.

## THE ISSUES

The widow and her daughters as appellants raise some twelve separate issues as matters for resolution by this Court on appeal. However, we would narrow them to the following:

I. Was the lower court correct in holding that one of the co-executors could file a petition for reappraisal of an asset in the estate and that the Orphans' Court ruling to the contrary was in error?

II. Was the lower court correct in ordering Mr. Bullough, the Louis Company auditor, to prepare a certified audit of the Company as of March 31, 1967, so as to reflect the value of each share of stock in the Company, according to sound and acceptable accounting practices?

III. Was the lower court correct in sustaining the Orphans' Court in removing Chambers as a co-executor under the Will and in removing him as a testamentary trustee?

IV. Was the lower court correct in surcharging Chambers for any sums allegedly accruing to him by virtue of his capacity as an officer

of the Louis Company while also serving as a co-executor and testamentary trustee, and for court costs but not other costs?

V. Was the lower court correct in reinstating the widow as executrix?

VI. Was the lower court correct in sustaining the demurrer of the Louis Company to the bill of complaint in the equity case brought by the widow and her daughters?

### I and II

Viewing these matters in retrospect, the issue of the quality of Chambers' conduct is the dominating theme which permeates all of the cases, yet, to keep matters in proper perspective we must address ourselves to the issues in the order of their chronological happening, some of which occurred before Chambers' conflict of interest became so apparent. That is why we commence with Chambers' petition in the Orphans' Court to reappraise the Louis Company stock as listed in the previously filed inventory.

After Chambers filed, as a co-executor, his petition to have a reappraisal, the widow immediately thereafter instituted her equity suit in which she sought the dismissal of Chambers as a co-executor and as a testamentary trustee. She then filed her preliminary objections to the petition for reappraisal raising the issue of jurisdiction of the Orphans' Court on the theory that the Orphans' Court lacked jurisdiction since, according to her contention, only an equity court could value stock subject to a voting trust. She also challenged the capacity in which Chambers was acting. In effect, she claimed that her equity suit now presented the only forum in which the matter could be adjudicated. The Orphans' Court, however, in dismissing Chambers' petition for reappraisal did so, not upon the basis of any of the reasons advanced by the widow, but on the ground that the petition had not been joined by the widow and hence was invalid since the co-executors "did not act in a single

entity," referring to Sykes, *Probate Law and Practice,*
§ 454. Judge Proctor, and we think correctly so, sum-
marily reversed the Orphans' Court on this issue, stat-
ing, "I am of the opinion that the Orphans' Court was
wrong; that one co-executor can seek revaluation of any
asset in the estate. If it were otherwise, it might result
in the grossest fraud on the beneficiaries of the estate."

To the lower court's conclusion we would add that we
think the Orphans' Court misinterpreted Sykes. A read-
ing of § 454 indicates to us that Sykes is primarily re-
ferring to suits by or against co-executors involving
claims for or against the estate. Characterizing the ac-
tions of the co-executors as a "single entity" does not
necessarily mean that they cannot act singly in certain
cases. Indeed, even Sykes acknowledges that where the
estate is sued, "co-executors need not, however, file briefs
jointly. They may plead different pleas * * *." Sykes,
*supra,* § 454, p. 416. Also in *Crothers v. Crothers,* 121
Md. 114, 117, 88 A. 114 (1913) our predecessors ob-
served:

> "* * * '[C]o-Executors are regarded in law as
> an individual person, and by consequence the
> acts of any one of them in respect to the ad-
> ministration of the effects are deemed to be the
> acts of all; * * *.' "

In *Tilghman v. Frazer,* 198 Md. 250, 256, 81 A. 2d 627
(1951) this Court also noted that:

> "* * * Both executors are equally responsible
> for the proper and prompt administration of
> their decedent's estate. Each owes to the other
> a reciprocal obligation to do his duty and to
> see that his associate meets his obligation.
> * * *"

In imputing ulterior motives to Chambers in filing the
petition for reappraisal of assets, the widow rivets her
attention on the voting trust agreement and the obliga-
tion of the Louis Company to purchase the Testator's

shares, to the complete exclusion of the impact which an overvaluation of the Louis Company stock will have on the federal estate tax picture. The widow obviously views any reappraisal of this asset in the inventory in the Orphans' Court as affecting the price the estate may receive from the Louis Company for these shares. This may or may not be a valid concern on her part, but it is certain that federal estate taxes would materially be affected by a reduction of the value placed on the stock. Without belaboring the point we would simply note that the reappraisal of the stock for the purposes of an inheritance tax should not be confused with the valuation of the stock pursuant to the computation provided by the voting trust agreement; they are not necessarily the same thing, nor should they necessarily serve the same purpose. The widow argues that for all intents and purposes the valuation of the Louis Company stock should be frozen at $314.80 per share or $240,507 for the entire bloc of stock held by the Schmidt estate. She states this because that was the valuation first quoted to her by Chambers and later by Bullough, the Louis Company auditor, several months after the Testator's death and this also is the valuation adopted by the Louis Company and the members of the voting trust in preparing and executing the 12 non-negotiable promissory notes with which to repurchase the Testator's stock from the estate.

The lower court was of the opinion that the Louis Company auditor never made a determination of the "book value" of the Louis Company stock as provided in Paragraphs 8 and 19 of the Voting Trust Agreement.[1]

---

1. Paragraphs 8 and 19 read in pertinent part:
   "8. Death of voting trust certificate holders—The company party of the first part, George J. Schmidt and Williams B. Phillips, parties of the second part, Walter R. Chalk, et al., certificate holders, parties of the third part, hereby agree that in the event of the death of any voting trust certificate holder the company will buy and the estate of the deceased voting trust certificate holder will sell to the company the voting trust certificate issued by the trustees owned or held by the estate of the deceased at the time of his death. * * *
            * * *
   "* * * The purchase price of said voting trust certificate

Indeed, it would appear that Bullough had never made any adjustment in the Company books for overvaluation of inventory and undervaluation of bad debts, which proper accounting practices should dictate. In fact, it appears that the $314.80 per share valuation was no more than the quotient of the number of shares divided into the net worth based on unaudited prior statements of the Company.

Judge Proctor further took the position that unless the quoted value of $314.80 per share, on the facts of the case, supported grounds for either an estoppel in pais or amounted to a novation of the repurchase agreement in the voting trust, there was nothing binding regarding the $314.80 per share figure quoted by Chambers and the Louis Company auditor.

The court below could not find wherein the widow or her daughters had acted to their detriment based on the knowledge of the $314.80 valuation and therefore no estoppel was present. *Wilson Brothers v. Cooey*, 251 Md. 350, 359, 247 A. 2d 395 (1968). Furthermore, on the basis of *District National Bank of Washington v. Mordecai*, 133 Md. 419, 427, 105 A. 586 (1919), recently favorably cited in *Leisner v. Finnerty*, 252 Md. 558, 564, 250 A. 2d 641 (1969), it does not appear that any novation occurred. Certainly, in this latter regard, there was no agreement between all of the parties (the widow, the

---

shall be the book value at the end of the month in which the death of the said voting trust certificate holder occurred. The determination of the book value of the stock of the company, which shall also be the book value of each voting trust certificate for a like number of shares, shall be made by the certified public accountant then servicing the company and such determination shall be conclusive on all the parties to this agreement. * * *."

\* \* \*

"19. Definition of Book Value—The parties hereto hereby declare that the book value of the capital stock of the said John C. Louis Company, Inc. shall be determined by the company auditor servicing the company but such auditor in computing book value shall not assign any value for the good will, trademark, trade-style, of the company nor any value to the distribution contracts and understandings with the manufacturers of the various machinery and equipment lines represented by the company."

Company, and the various members of the voting trust) to any new contract, an element essential to a novation. It would appear that at least three members of the voting trust were not apprised of pertinent events until some time after the widow had filed her bill in equity. Of more significance, however, is the fact that the widow admits in her own testimony that shortly after her husband's death Chambers came to her with a form that had to be filled out for estate purposes and that he stated that he was going to put down the value of the Louis Company stock at $270 per share, but that he intended to have it reappraised at a later date. The record is most persuasive that Chambers, in good conscience, had reason to be skeptical of the $310 per share appraisal, that was actually used in the Orphans' Court inventory, as being overvalued.

What further bothered the lower court regarding the reappraisal of the Louis Company stock was the manner in which the appraisal should be made. There is reference in the Testator's Will that the sale of his stock would be governed by the voting trust agreement in force at the time of his death and this agreement spelled out guide lines for arriving at the "book value" of the stock at which the stock should be repurchased. However, we gather from the lower court's discussion on this point, and it is certainly our conclusion, that the method for valuing the stock spelled out in the voting trust would not necessarily be applicable to the making of a proper appraisal in the Orphans' Court. This specific point, however, becomes, in our opinion, academic in view of the order which Judge Proctor finally entered regarding the reappraisal of the stock, which we hold to be correctly stated and in keeping with the determination of "book value" as set forth in *Land & Simmons Co. v. Arconti,* 223 Md. 204, 212, 162 A. 2d 478 (1960) ; and *Hagan v. Dundore,* 187 Md. 430, 443-445, 50 A. 2d 570 (1947). (Note also the dissent in *Land & Simmons* wherein the illusive concept of "book value" is fully discussed.) We would also make the observation that the book value in

this case, insofar as whether it may rightfully serve as the basis for the appraisal of the stock in the inventory of the estate, would be a proper valuation. We say this because in a corporation wherein the stock is closely held, such as in the case at bar, there is little or no opportunity for the establishment of a "market value" of the stock in the accepted sense of that term. See Code (1969 Repl. Vol.) Art. 93, § 7-202. Accordingly, we agree with the directive of the lower court regarding the reappraisal of the Louis Company stock, wherein it stated:

> "2. That Mr. G. Van Ness Bullough is hereby directed to determine the book value per share of the common stock of the John C. Louis Co., Inc. as of March 31, 1967, said determination to be based upon a certified audit to be prepared by him as of that date and to be made in accordance with paragraphs 8 and 19 of the Voting Trust Agreement of September 15, 1962, and paragraph 2 of the Supplemental Voting Trust Agreement of November 30, 1964, and in accordance with sound and accepted accounting practices, said determination not to be influenced by any subsequent business events of the company relating to accounts receivable, inventory or the like."

> 3. That the determination to be made by G. Van Ness Bullough shall, after an opportunity for hearing and absent any showing of fraud, bad faith or the failure to adhere to the applicable provisions of the agreements recited in paragraph 2 hereof or the failure to adhere to sound and accepted accounting practices in connection therewith shall be conclusive as to the valuation of the stock of the estate of George J. Schmidt in the John C. Louis Co., Inc."

For the authority of a court of equity to resolve such an issue arising in the administration of an estate, see the recent case of *Jackson v. Jackson,* 260 Md. 138, 141, 271

A. 2d 690 (1970), wherein we stated: "In the usual case, questions of testamentary construction lie exclusively within the jurisdiction of an equity court. [Citations omitted]."

### III and IV

We think it clear from the record in this case that Chambers, in all probability, unwittingly, and while acting in a manner he sincerely thought best for the interests of the beneficiaries of the Testator's estate, engaged in conduct which resulted in a conflict of interest. It is obvious that he became so engrossed with the future prospects of the Louis Company and the challenge that its management presented to him that he subordinated the interest of the estate to that of the Company. He undoubtedly adopted the philosophy that "What is good for General Motors, is good for the Country" [2]—in the sense that he believed that what was good for the Louis Company, was good for the Testator's estate. Assuming, *arguendo,* that his conclusion may have been correct, nonetheless, we are of the opinion that the case law of this State establishes such rigid guide lines for the conduct of an executor or a trustee that Chambers' actions, as supported by the facts, transcended acceptable limits. The lower court in describing his conduct used the cliché that, "Chambers was wearing too many hats." It found that, "* * * there is a definite conflict of interest between his duties and responsibilities as the chairman of the board and chief executive of the Company, and his duties and responsibilities under the last Will and Testament of Mr. Schmidt." Specifically, we note numerous instances in the record where Chambers seemed more concerned about the effect that the payments under the stock repurchase agreement would have on the Louis Company, than the effect that the lack of such payments might have on the funding of the trusts established in the Testator's Will. Furthermore, even attributing to

2. Attributed to Secretary of Defense (1953-1957) Hon. Charles E. Wilson in testimony before the U. S. Senate, 1953.

Chambers an astute talent for business management, one would be overly naive not to think that his position as a co-trustee under the voting trust agreement and later as the sole trustee, did not assist him in ascending to the presidency of the Company within a relatively short period of time with attending salary emoluments. There would also be the matter of purchasing a portion of the new stock issues, an opportunity which certainly came his way because of his bifurcated status.

In *Holmes v. Sharretts,* 228 Md. 358, 371, 180 A. 2d 302 (1962), a case wherein an effort was made to oust a voting trustee, we had occasion to state:

> "An application by a *cestui que trust* to remove a trustee is addressed to the sound discretion of the court, and its action in refusing to remove the trustee will not be reversed unless it appears that such discretion has been abused. *Mangels v. Tippett,* 167 Md. 290, 173 Atl. 191 (1934) ; *Whiting v. Bryant,* 131 N. E. 2d 425 (Ohio 1956). The findings of the Chancellor on questions of fact are presumptively correct. *Parker v. Parker,* 222 Md. 69, 158 A. 2d 607 (1960). We find no abuse of discretion or clear error as to the facts in this case by the Chancellor. Maryland Rule 886 a. [Now Rule 886]."

Judge Proctor, in the court below, relied heavily upon the law as set forth in *Mangels v. Tippett,* 167 Md. 290, 173 A. 191 (1934). In that case the Testator had appointed one Tippett and the Safe Deposit and Trust Company as testamentary trustees under his will. The main asset of the estate was a 50% interest in the Mangels-Herold Company, a successful syrup refinery. After the death of Mangels, unbeknown to the widow or the other beneficiaries of the testamentary trust, Tippett was elected a director of the Mangels-Herold Company as a representative of the Mangels' interest and also secretary of the company at a salary of $50.00 per week.

Although the company during the ensuing year made $35,000 in profits, the Mangels estate, owning half of the stock, received only $6,500 in dividends. The widow became dissatisfied and sought to have Tippett removed as a trustee and further petitioned that he be made to account for the salary that he received as secretary of the corporation. The chancellor dismissed the widow's petition. On appeal, Judge W. Mitchell Digges, for the Court, reversed the decree, holding that although Tippett's conduct did not justify his removal as a trustee, noting in this regard that he was not the sole trustee, nonetheless, was of the opinion that the case should be remanded so that Tippett could be called upon to account for the emoluments he had received as an officer of the corporation. In our opinion the following language of *Mangels,* wherein the court articulates the principles of law applicable to a trustee's duty to his beneficiary and his accountability for benefits accruing to him as a result of his fiduciary position, is dispositive of issues III and IV in the case at bar:

> "The relief prayed for here, in addition to the removal, is an accounting by the trustee for the money which he received as secretary of the corporation. This question is governed by a broad and most salutary equitable principle, which may be thus stated: *that a trustee,* or one acting in a fiduciary capacity, *is not permitted to place himself in such position that the interest of the beneficiary and his own personal interest do or may conflict; and the question of whether or not such a position has resulted in a benefit or loss to the beneficiary is not permitted to be inquired into.* In *Perry on Trusts and Trustees* (7th Ed.) section 427, it is said: 'Trustees hold a position of trust and confidence. The legal title of the trust property is in them, and generally its whole management and control is in their hands. At the same time the beneficiaries of the trust may be women or children

or persons incompetent to protect their own interests. For these reasons, to protect the weak and helpless on the one hand, and to prevent trustees from using their position and influence for their own gain, and to prevent them from hazarding the trust property upon what they may think to be profitable speculations, on the other, they are not allowed to make any profit from their office. *They cannot use the trust property, nor their relation to it, for their own personal advantage.* All the power and influence which the possession of the trust funds gives, must be used for the advantage and profit of the beneficial owners, and not for the personal gain and emolument of the trustee. No other rule would be safe; nor would it be possible for courts to apply any other rule, as between trustee and *cestui que trust. A trustee will not be allowed to retain for himself a profit made from his dealings with trust property, although he is able to show that the profit was not made at the expense of the trust.'* " (Emphasis supplied.) 167 Md. 290, 300-301.

We would also note that the Court cited 3 *Pomeroy's Equity Jurisprudence* (4th Ed.) § 1077, to the effect that the trustee's duty is such that he "* * * cannot place himself in any other position which would subject him to conflicting duties, or expose him to the temptation of acting contrary to the best interests of his original *cestui que trust.* * * *" Indeed, the Court in *Mangels* quoted from *Hoffman Coal Company v. Cumberland Coal and Iron Company,* 16 Md. 456 (1860), using Chief Judge LeGrand's ominous admonition to trustees, "* * * remembering the weakness of humanity, its liability to be seduced, by self-interest, from the straight line of duty, the sages of the law inculcate and enjoin a strict observance of the divine precept: '[l]ead us not into temptation' * * *"

Chambers in justifying his actions as a corporate of-

ficer of the Louis Company, as well as that of trustee, under the testamentary trust under the Testator's Will, relies heavily upon *Dailey v. Wight,* 94 Md. 269, 277-278, 51 A. 38 (1902). In that case Wight, the testamentary trustee, in his own right owned 33⅓% of the stock of Sherwood Distilling Company, around which the controversy revolved. He and his brother jointly owned another 33⅓% of the stock and the brother owned outright, still another 8⅓%. The testamentary trust held only 22% of the stock. After the Testator's death the trustee, Wight, and his brother were voted salaries as officers of the Company in the amount of $10,000 and $5,000 respectively. The Court of Appeals affirmed a decision of the circuit court wherein it refused to replace the trustee, on the theory that the trustee did not need to vote the stock held in trust in order to control the vote whereby he was elected an officer of the Company and voted a salary.

In this case Chambers claims that he was elected to his corporate offices and given his salary increases, not by virtue of his voting the Testator's stock in his role as a testamentary trustee, but, rather, by virtue of his capacity as a voting trustee under the voting trust agreement to which the Testator was a party during his lifetime and in which he expressly provided that Chambers be his alternate voting trustee in the event of his death.

Our reaction to the above contention is, that Chambers' duties as a co-executor, as a testamentary trustee and as a voting trustee under the voting trust are all interrelated and were intended by the Testator to be for the protection of his estate, rather than for the welfare of the Louis Company, when the latter is viewed in juxtaposition with his widow and daughters. Therefore, the voting of the stock by Chambers is not essentially different in this case than the voting of the stock by the trustee Tippett in *Mangels,* or for that matter by the trustee Wight in *Dailey.* The central question is, was the stock that was voted helpful in achieving the office or

salary with which the trustee became vested. The lower court thought that it was and so do we.

We are of the opinion that in this case the same conflicts of interest which pursued Chambers in his role as trustee affects his status as co-executor and the lower court was correct in sustaining the Orphans' Court's removal of Chambers. This Court has repeatedly stated, "the right to administer, however, is a valuable one; consequently, an executor or administrator will not be removed except for legal causes, and after citation and an opportunity to be heard. * * *" *Wheatley v. Fleischmann*, 216 Md. 157, 162, 140 A. 2d 152 (1958). In the instant case we think a substantial conflict of interest persisting over a number of months presented adequate legal cause. We would further note that under Rule 886, we may only reverse the findings of facts of the lower court in the event that it was clearly erroneous, and in this instance we cannot say that it was.

The Court in *Mangels,* also held that Tippett had to pay to the beneficiaries one-half of the salary he received from the time he was first appointed secretary of the Company, arriving at this result on the theory that Tippett represented the Mangels estate as trustee and it owned one-half of the stock of the Company, and therefore the net return to the estate was lessened by one-half by the payment of the salary to Tippett. In the instant case, Judge Proctor used the same formula averaging out the estate ownership of stock in the Louis Company at 34.5% at the time of his decree, as there had been some additional stock issued subsequent to the death of the Testator, and he required Chambers to account to the estate for 34.5% of his emoluments. This will shortly be discussed in some detail, but before leaving this question of the duty and accountability of a trustee, we would cite as authority, in addition to the cases already mentioned, *Carey v. Safe Deposit and Trust Company,* 168 Md. 501, 178 A. 242 (1935) ; *Adams v. Hearn,* 168 Md. 544, 555, 178 A. 606 (1935) ; *Polk v. Linthicum,* 100 Md. 615, 60 A. 455 (1905) ; Clapp, *A Fiduciary's Duty of*

*Loyalty,* 3 Md. Law Rev. 221, 229, 232; also 3 Bogert, *Trust and Trustees,* § 543, wherein he notes that, "* * * [A] trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor most sensitive, is then the standard of behavior. * * *"

The record shows that the salary increases received by Chambers from the Louis Company from August 2, 1967, the date on which he was named vice-president and general counsel (with his first salary increase subsequent to the death of the Testator) until December 31, 1970, adds up to $23,925.00 of which 34.5% (the percentage of stock held by the Testator's estate) amounted to $8,254.13. This was the sum for which the court found that he should account to the estate of George J. Schmidt. We agree both with the formula used in computation and the result obtained by the court below.[3]

The record is not as clear as it might be concerning the number of shares of stock owned by Chambers. It would appear, however, that on August 2, 1967, Chambers purchased 40 shares at $251.84 per share and on October 17, 1969, 25 shares at $200 per share. It further appears that Chambers is still purchasing stock or voting trust certificates out of withholdings from his salary. There is also evidence which indicates that the $200 per share price represents stock purchased at a 20% discount. The lower court directed that regarding his stock hold-

---

**3.** The lower court's calculations were based on the following: From August 2, 1967, to January 13, 1969, a period of 75 weeks, Chambers had received a salary increase of $25.00 per week. This amounted to $1875.00 which is attributable to his holding the office of vice-president. From January 13, 1969, to September 22, 1969, a period of 36 weeks he received an additional $100 compensation a week which amounted to $3,600.00 and is attributable to his holding the office of chairman of the board. On September 22, 1969, to February 19, 1970, a period of 22 weeks Chambers received an additional compensation of $225.00 per week which amounts to $4,950.00, which is attributable to his holding the office of chairman of the board. From February 19, 1970, to December 31, 1970, a period of 45 weeks, Chambers received an increase of $300 per week which amounts to $13,500, and is attributable to his holding the office of chairman of the board. These increases aggregate to $23,925.00 of which 34.5% is $8,254.13.

ings, that if the audit to be made by Bullough as of March 31, 1967, shows that the book value of the stock per share was greater than $200, then Chambers must account to the Testator's estate for 34.5% of the difference between the $200 purchase price paid per share and the actual book value per share. However, the court's order is limited to 50 shares. No issue was made concerning the number of shares which Chambers purchased; accordingly, we will not disturb this part of the lower court's order.

The appellants also object to the lower court's refusal to charge Chambers with expenses and damages with regard to attorneys' fees, Orphans' Court transcripts and other costs and limiting his liability for costs to the cost of the consolidated hearing before the lower court. They in effect are predicating their argument on alleged bad faith on Chambers' part and that he "conspired with others to protract litigation." The question of costs is a matter of the discretion of the equity court in a case such as this. Maryland Rule 604 a, b, and c. If Chambers had been guilty of fraud, bad faith or had instituted frivolous litigation without justification, then there might have been some merit to the appellants' demands that he make payment for attorney's fees, etc., however, the lower court found that this was not the case and we see no reason to disturb its ruling. See *Sinclair Estates v. Guthrie*, 223 Md. 572, 575, 165 A. 2d 775 (1960); *McGaw v. Acker, Merrall & C. Co.*, 111 Md. 153, 160, 73 A. 731 (1909).

## V

The issue of whether the lower court was correct in reinstating the widow as the executrix under the Testator's Will has, to a great extent, already been answered by what we have heretofore discussed in this opinion. As stated in *Wheatley v. Fleischmann, supra,* the right to administer an estate is a valuable one and an executor may not be removed except for legal cause. In this case the issue of the removal of the executrix was appealed to the circuit court and on appeal was heard *de novo*.

We do not find that the lower court was clearly in error in its reinstatement of the widow as executrix. Certainly, she was not confronted with the problem of a conflict of interests as was Chambers, nor was she serving in any dual capacity.

## VI

Finally, the appellants contend that the court below erred in sustaining the demurrer of the Louis Company to the bill of complaint in the equity case brought by the widow and her daughters. They argue that because the main issue in the equity case was the book value of the Louis Company stock, that Louis Company was a real party at interest and was properly joined as a defendant in the bill, as the appellants are aggrieved by its actions regarding the determination of the book value of the stock as provided by the stock repurchase agreement. We think that the short answer to this contention is, that under the Testator's Will, by Item X, Paragraph A, the trustee is given the right to retain any assets as investments, should he in good faith determine that they should be held, as a part of the corpus of the testamentary trust. As we see it the allegations set forth in the equity suit were strictly matters between the beneficiaries and the trustee and stated no cause of action against the Louis Company. However, the appellants' concern regarding this issue may be for naught, as we note that counsel for Chambers state in their brief that they have been authorized by the Louis Company to advise this Court that it will consider itself bound by any decision of this Court as to whether or not the stock value is to be determined by the Company's accountant.

However, over and above the reasons just cited as to why the Louis Company should not have been joined as a party defendant below, there are procedural reasons which cannot be ignored and which justified the lower court in refusing to allow it to be joined.

The demurrer of the Louis Company was sustained on October 2, 1968, with leave to appellants to file an

amended bill within thirty days. An amended bill was filed by the appellants against Chambers only, the Louis Company being omitted. When the various suits were consolidated for trial in the circuit court, a pre-trial conference was held on September 22, 1970, and upon the termination of this conference the court recited in its order the cases consolidated and the manner in which they would be heard. Although the appellants participated in this conference and the cases were set for trial for October 16, 1970, no objection was raised regarding the omission of the Louis Company as a party defendant. Indeed nowhere in the record can we find any further motions regarding the joining of the Louis Company. The appellants claim, however, that mention of their demand that Louis Company be joined was made orally in conjunction with their motion for a new trial in the law cases, although neither the court nor opposing counsel could recall such oral motion. In any event it would be tantamount to asking that a new party be joined midway through litigation when the opportunity and apparent necessity to do so (which we do not agree was the situation in this case) was known for many months. Under the totality of the circumstances we view this issue as insubstantial.

We affirm the final decree issued by Proctor, J., on January 12, 1971, in all respects.

> *Decree affirmed, appellants to pay half of the costs and the appellees to pay half of the costs.*